**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Edward J. ELKINS,**
**Defendant–Appellant.**

**No. 87–8708.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 29, 1989.

Steven K. Frankel, New York City and P. Bruce Kirwan, Meals, Kirwan, Goger, Winter & Parks, Atlanta, Ga., for defendant-appellant.

William P. Gaffney, Asst. U.S. Atty., Atlanta, Ga. and Mervyn Hamburg, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before RONEY, Chief Judge, JOHNSON, Circuit Judge, and MELTON *, District Judge.

JOHNSON, Circuit Judge:

This case arises on appeal from defendant's convictions of conspiracy in violation of 18 U.S.C.A. § 371, and of engaging in or aiding and abetting illegal export activity in violation of the Export Administration Act, 50 U.S.C.A.App. § 2410, the Arms Export Control Act, and the International Emergency Economic Powers Act, 50 U.S.C.A. §§ 1702, 1705, 15 C.F.R. §§ 374.1, 387, and 399, and 18 U.S.C.A. § 2. We affirm.

## I. FACTS

This prosecution arose out of an investigation into the 1985 shipment of two Lockheed L–100–30 aircraft to Libya. At the time, Libya was (and remains) subject to strict export controls. *See* 15 C.F.R. § 376.16; *see also* Executive Order No. 12543, January 7, 1986, 51 Fed.Reg. 875 (prohibiting trade with Libya). Export licenses were required for the export of these two jets; because of government restrictions on trade with Libya, no export licenses would have been given to export these planes to Libya. Defendant and several other individuals, six of whom were also indicted as a result of this investigation, engaged in a complex set of transactions to purchase the planes for a West German company owned and operated by Libyans, and to route the planes through Bourdeaux, France, to the small African nation of Benin, and then to Libya.

The sequence of events leading to defendant's arrest is complicated. Defendant owned Armaflex, Inc., a southern California company which produced ceramic tiles for military use as armor. In 1984, defendant attempted to supply ceramic tiles to an English firm for ultimate transfer to Libya. The Libyan dealer was named Ba-

dir, and he was purportedly associated with a West German oil field production company. This deal was never consummated.

In the summer of 1984, Carl Lilly, who had worked with defendant in the ceramic tile negotiations, approached defendant on behalf of a customer[1] who wanted to purchase one Lockheed C–130 aircraft, a military transport plane, for oil field work in Libya. Because this plane had potential military application, the sale had to be cleared by the State Department. The State Department responded to inquiries about the export of this aircraft to Libya by stating that the transaction would not be approved. Baskett, a military officer who became defendant's employee, informed defendant of this refusal. Defendant then suggested an alternative plan that involved leasing the aircraft by Armaflex on behalf of Badir's West German company, TOP, or its subsidiary, Contrust, and basing it in Greece or Malta. Because this arrangement involved a lease rather than a sale to a company for use in Libya, the Department of Commerce, rather than the Department of State, would have had to approve it. The Commerce Department rejected this alternative. At about this time, the Air Force reclassified the KC–130[2] to make it impossible for a private company to obtain one of the aircraft unless acting on behalf of or sponsored by an acceptable foreign government. Badir and Lilly attempted to obtain sponsorship first from Morocco and subsequently from Bolivia. The government of Bolivia did sponsor the purchase temporarily, but disavowed that sponsorship after its agent in the negotiations, General Rodriguez, unsuccessfully attempted to overthrow the government.

At this point, defendant adopted the recommendation of an employee, Franklin, and suggested to Lilly that the customer, Corcoran, substitute the L–100–30 model

---

* Honorable Howell W. Melton, U.S. District Judge for the Middle District of Florida, sitting by designation.

1. The customer was Corcoran, Lilly's father-in-law and a co-indictee, who was purportedly representing National Oil Company. Badir, the

Libyan national involved in the prior transaction, was the ultimate recipient of the planes.

2. The KC–130 is a modified version of the C–130 with air-to-air refueling capability. Badir indicated in November 1984 that he desired the KC–130 version.

for the KC–130, because the L–100–30 model did not need foreign sponsorship and because the Department of Commerce rather than State would review the transaction. Badir requested information about the L–100–30 aircraft, which defendant provided. Shortly after this communication, Badir inquired into modification kits for the L–100–30 to allow air-to-air refueling. Lilly discussed the modification with defendant. Defendant suggested a company in England, Flight Refueling Systems, that had modification kits available. After it became clear that the British company could not meet Badir's demands, defendant contacted a California company, Aero Union, about modification kits. Defendant did not disclose consideration or discussion of this modification to Lockheed, and defendant ordered Baskett to refrain from discussing it.[3]

Defendant originally negotiated with Lockheed as representative of Contrust, the West German oil exploration subsidiary controlled by Badir. Lockheed preferred to sell the aircraft to Armaflex, Inc., rather than to Contrust. Defendant created a second California corporation, AFI International, to represent Contrust in the negotiations. In negotiations with Lockheed, defendant maintained that the airplane was destined for the West African country of Benin. When Lockheed learned of Badir's involvement, however, Lockheed cancelled a March 1, 1985, negotiating session. Defendant quickly assured Lockheed that Badir represented a legitimate West German concern, and that he was a Libyan expatriate antagonistic to the Libyan government. The interruption in the negotiations arising from Lockheed's enlightenment about Badir's involvement was brief, and negotiations between defendant and Lockheed resumed. Defendant continued to assert that Badir had no connection with the Libyan government. At no time did defendant notify Lockheed that the plane was to be modified with mid-air refueling capability.

Defendant and Lockheed reached an agreement on the sale of two L–100–30

planes and parts. Defendant mailed the contract to Lilly in West Germany; Lilly traveled to Tripoli to deliver the contract to Badir and Badi, Badir's superior. While in Tripoli, Lilly also met with Abid Al–Jawwad, the banker for the transaction. While Lilly was traveling, defendant and Lockheed representatives executed the contract for the sale of the two L–100–30 airplanes to AFI. Defendant's net profit on the deal exceeded $7 million. The contract provided, among other things, that AFI had the sole responsibility to obtain a valid export license.

Lockheed officials accompanied defendant to the Department of Commerce to obtain an export license for the airplanes. Department of Commerce officials realized that Contrust, the West Germany company receiving the planes, was owned by Libyans. Defendant explained that the planes were destined for Benin. At no time did defendant mention the planned refueling modification.

The Department of Commerce approved the export license on April 18, 1985. Lockheed delivered the aircraft within a month to Benin. The planes were never seen again in Benin. One of the airplanes was found at an airport in Cairo, Egypt, on March 7, 1987. The plane's radio signal and operations manual indicated that the plane had been used by the Libyan Arab Air Force.

Defendant was convicted on one count of conspiracy in violation of 18 U.S.C.A. § 371, and one count of violating export restrictions in violation of 50 U.S.C.A. App. § 2410, 50 U.S.C.A. § 1705, and 18 U.S.C.A. § 2. Defendant received a five-year sentence on count one. Defendant received a consecutive ten-year sentence on count two and a $6,600,000 fine. A $50 per count special assessment was also imposed. Defendant appeals.

## II. DISCUSSION

### A. The Effect of McNally

The jury returned a verdict of guilty on Count One of the indictment which charged

3. This refueling modification was critical, because at the time Libya did not have air-to-air refueling capability. Badir purchased the plane

contingent upon the availability of the modification, and entered into a Memorandum of Understanding with Elkins to that effect.

defendant with conspiracy to commit four substantive offenses against the United States.[4] Conspiracy to commit an offense against the United States violates 18 U.S.C.A. § 371, which provides:

> If two or more persons conspire *either* to commit any offense against the United States, *or* to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

(emphasis added). This statute is written in the disjunctive. A violation occurs if the defendant conspires to commit one or more substantive offenses against the United States, or if the defendant conspires to defraud the government in any manner or for any purpose.

Defendant was charged with conspiring to commit, among other things, the substantive offense of wire fraud against the United States. *See* 18 U.S.C.A. § 1343. That statute prohibits the use of wire transmission services in furtherance of any scheme or artifice to defraud. The object of the scheme alleged was to defraud the United States of the right to implement its foreign policy free from stealth, false statement, and fraud.

Three weeks after defendant's conviction, the Supreme Court decided *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). In *McNally*, the Supreme Court held that 18 U.S.C.A. § 1341, the mail fraud statute,[5] applies only to schemes to defraud others of property rights. The Court held that a scheme to defraud citizens of their interest in fair and effective government does not violate section 1341. *Id.* 107 S.Ct. at 2879. Thus, the wire and mail fraud statutes are limited to schemes to deprive others of property rights, although the object of the scheme to defraud may be intangible property rights. *See Carpenter v. United States*, 108 S.Ct. 316 (1987).

■ *McNally* applies retroactively. *See Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987); *see also United States v. Asher*, 854 F.2d 1483, 1487 (3rd Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 836, 102 L.Ed.2d 969 (1989). Under *McNally*, defendant could not be convicted of the substantive offense of wire fraud where the object of the scheme was to deprive the government of its right to control its foreign policy. *See generally United States v. Dynalectric Co.*, 859 F.2d 1559, 1570 (11th Cir.1988). Because the object of the scheme to defraud the government alleged in the indictment is not sufficient to violate section 1343, that scheme does not constitute conspiracy to commit a substantive offense against the United States in violation of the first portion of section 371. *See McNally*, 483 U.S. at 361, 107 S.Ct. at 2882 ("The Government concedes that if petitioners' substantive mail fraud convictions are reversed their conspiracy convictions should also be reversed."); *see also United States v. Hilling*, 863 F.2d 677 (9th Cir.1988).

■ An individual may also violate section 371, however, by conspiring to defraud the United States in any manner or for any purpose. The scope of "defraud" in section 371 is broader than "defraud" as used in section 1343. In *McNally* itself, the Court stated that to "defraud" the government within the meaning of section 371 "also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." *McNally*, 483

---

**4.** The indictment charged defendant with conspiracy to violate:

 (1) the Export Administration Act of 1979, as amended, Title 50, United States Code Appendix, Section 2410(a) ..., (2) the Arms Export Control Act, Title 22, United States Code, Sections 2778(b)(2) and 2778(c), and Title 22, Code of Federal Regulations, Sections 121, *et seq.;* (3) Title 18, United States Code, Section 1001 and (4) Title 18, United States Code, Section 1343.

**5.** The *McNally* analysis applies equally to wire fraud. *See Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 320 n. 6, 98 L.Ed.2d 275 (1987) ("The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here.").

U.S. at 358 n. 8, 107 S.Ct. at 2881 n. 8 (quoting *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)). Therefore, although the object of the scheme alleged in the indictment, to defraud the government of its right to implement its foreign policy, would not support a wire fraud conviction after *McNally,* it would support a conviction under section 371 of conspiracy to defraud the government.

■■■ "[A] general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground." *Zant v. Stephens,* 462 U.S. 862, 881, 103 S.Ct. 2733, 2745, 77 L.Ed.2d 235 (1983). A conviction can be affirmed, however, where the legally insufficient charge includes all the elements of a separate, legally sufficient charge also contained in the indictment. In such a situation, the reviewing court can be confident that if the jury found all the elements necessary to convict the defendant on the legally insufficient charge, it must also have found all the elements necessary to convict on the legally sufficient charge. *See, e.g., United States v. Kato,* 878 F.2d 267, 269–70 (9th Cir.1989); *United States v. Odom,* 858 F.2d 664, 666 n. 1 (11th Cir.1988); *see generally United States v. Ochs,* 842 F.2d 515, 520 (1st Cir.1988). In this case, if the jury convicted defendant on the wire fraud charge, it necessarily must have found all the elements necessary to sustain a conviction for conspiracy to defraud the government under section 371.

This Court cannot affirm a criminal conviction based on a theory not contained in the indictment, *see generally Stirone v. United States,* 361 U.S. 212, 215–17, 80 S.Ct. 270, 272–73, 4 L.Ed.2d 252 (1960), or not presented to the jury. *See generally Chiarella v. United States,* 445 U.S. 222, 237 n. 21, 100 S.Ct. 1108, 1119 n. 21, 63 L.Ed.2d 348 (1980). The scope of a conspiracy is that charged in the indictment. *United States v. Dynalectric Co.,* 859 F.2d at 1564. Conspiracy to defraud is a differ-

ent substantive offense from conspiracy to commit wire fraud. *See e.g., United States v. Sjeklocha,* 843 F.2d 485, 486 (11th Cir. 1988). The dispositive issue on defendant's appeal from his conspiracy conviction, then, is whether the indictment charged him with conspiracy to defraud the United States.

An indictment must set forth the elements of the offense in a manner which fairly informs the defendant of the charges against him and enables him to enter a plea which will bar future prosecution for the same offense. *Belt v. United States,* 868 F.2d 1208, 1211 (11th Cir.1989) (citing *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974)). *See generally Russell v. United States,* 369 U.S. 749, 763, 82 S.Ct. 1038, 1046, 8 L.Ed.2d 240 (1962). In this case, the indictment charged defendant with conspiracy to commit four substantive offenses against the United States. Although the fraud was charged as the object of the substantive offense of wire fraud rather than as the object of the conspiracy, defendant had clear notice that violations of the substantive offenses constituted fraud against the government. Conspiracy to violate the substantive offenses *is* conspiracy to defraud the government. Reading the indictment as a whole, we conclude that the indictment adequately charged defendant with conspiring to deprive the United States of its ability to control its foreign policy by concealing material facts from responsible government agencies.

We also conclude that the district court adequately charged the jury on conspiracy to defraud the United States. The court instructed the jury fully on the elements of conspiracy. The court then instructed the jury as follows:

> The fourth object of the conspiracy was to devise a scheme and artifice to defraud the United States and its executive agencies of the right to implement its foreign policy and to conduct its affairs free from stealth. Here again, it is alleged that it was a part of this object of the conspiracy that interstate or international wire communications would be used.

Vol. 29, at 17–18. The district court clarified and repeated this instruction as follows:

> What must be proved beyond a reasonable doubt is that the accused planned knowingly and willfully to devise or intending—to devise a scheme to defraud the United States of America and its executive agencies out of the right to implement its foreign policy and to conduct its affairs free from stealth, false statement, and fraud and that the use of the interstate wire or foreign wire communications were to be closely related to the scheme.

Vol. 29, at 34. Conspiracy to commit wire fraud against the United States contains all of the elements of conspiracy to defraud the United States. Conspiracy to commit wire fraud contains the additional element of use of wire transmission services in furtherance of the scheme to defraud. The district court's charge to the jury, as indicated by the above passages, instructed the jury fully on the elements of conspiracy to defraud the United States in violation of section 371.

The jury could not have convicted defendant of conspiracy in this case without having found an unlawful object of the conspiracy. The indictment adequately charged defendant with conspiracy to defraud the United States, and the jury was adequately charged on this object of the conspiracy. Under similar circumstances, *Kato, supra,* the Ninth Circuit affirmed a defendant's conspiracy conviction. We agree with the logic of the Ninth Circuit in *Kato,* and the First Circuit in *Ochs,* and consequently we affirm defendant's conviction on the conspiracy count in this case.

### B. *The Allen Charge*

The jury began deliberating on May 27, 1987. On June 5, 1987, the jury sent a note to the judge indicating it was deadlocked 8–4 on Count Two, the export violations charge. The district judge did not advise counsel that he had been informed of the numerical breakdown of the deadlock. In response to this note, and over defendant's objection and motion for a mistrial, the district judge gave the jury a modified *Allen* charge. *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The jury rendered a verdict of guilty that same day.

■ This Circuit allows the use of *Allen* charges. *See Thaggard v. United States,* 354 F.2d 735, 739 (5th Cir.1965),[6] *cert. denied,* 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301 (1966); *see also United States v. Rapp,* 871 F.2d 957, 967 (11th Cir.1989); *United States v. Norton,* 867 F.2d 1354, 1366 n. 14 (11th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 3192, 105 L.Ed.2d 701 (1989); *United States v. Rey,* 811 F.2d 1453, 1457–60 (11th Cir.), *cert. denied,* 484 U.S. 830, 108 S.Ct. 103, 98 L.Ed.2d 63 (1987). This Court's inquiry on appeal of a district court's decision to give an *Allen* charge is limited to evaluating the coercive impact of the charge. *United States v. Alonso,* 740 F.2d 862, 878 (11th Cir.1984), *cert. denied,* 469 U.S. 1166, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985). The question we address is whether under the circumstances and language of the *Allen* charge the jury was unduly coerced into reaching a verdict. *See Norton,* 867 F.2d at 1365–66; *Alonso,* 740 F.2d at 878.

■ The language the district court used in this case did not deviate from language used in accepted *Allen* charges. Thus, the language itself did not unduly coerce the jury into reaching a verdict. *See Rey,* 811 F.2d at 1459. The circumstances also do not indicate coercion. Although the jury had not reached a verdict prior to the *Allen* charge, the district court had the discretion to urge the jury to spend more time deliberating. *See, e.g., United States v. Gordon,* 817 F.2d 1538, 1543 (11th Cir.1987), *vacated in part on other grounds,* 836 F.2d 1312 (11th Cir.1988), *cert. dismissed,* — U.S. ——, 109 S.Ct. 28, 101 L.Ed.2d 979 (1988). Although the jury returned a verdict the same day that the judge gave the

---

**6.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

charge, there is no indication that this charge was inherently coercive. *See Rapp*, 871 F.2d at 967; *Rey*, 811 F.2d at 1458.

Defendant challenges the timing of the charge, because the district court gave the charge on a Friday afternoon. The timing of the charge lies in the discretion of the trial court. *See Alonso*, 740 F.2d at 877. The judge gave the *Allen* charge after eight days of deliberation and only after the jury informed him it was deadlocked. There was no abuse of discretion in the timing of the charge. *Compare United States v. Scruggs*, 583 F.2d 238, 239–41 (5th Cir.1978) (charge given *sua sponte* at 10:28 p.m. on a Friday night was not an abuse of discretion).

Defendant argues his conviction must be reversed because the district court knew the numerical split of the jury at the time it gave the charge. The fact that the judge was aware of the split in the vote does not necessarily mean that this charge was coercive. *See United States v. Norton*, 867 F.2d at 1365–66 (no reversal even if district judge knowing numerical split gives *Allen* charge absent a showing that the knowledge and the charge were inherently coercive). The district court did not request that information, and, in fact, the court expressly charged the jury not to divulge any numerical breakdown should the jury request further instructions. In these circumstances, we conclude that the district judge's *Allen* charge did not unduly coerce the jury into reaching a verdict.

## C. *Evidentiary Challenges*

The government introduced into evidence two documents used to show that the Libyan military had purchased these aircraft. The documents were found in West Germany in a briefcase allegedly owned by Badir. One was a letter by Jabir, purportedly the head of the Libyan military, to Badi, Badir's superior, authorizing the purchase of two L–100–30 jet aircraft with air-to-air refueling capability. The other was a progress report written by Badir to "Chief of Staff Colonel Ahmad Mahmoud" about the purchase of the jets. Defendant challenges the admission into evidence of these letters on several grounds.

### 1. Rule 403

Defendant argues that the district court erred under Fed.R.Evid. 403 in admitting these documents into evidence. Fed.R. Evid. 402 provides that all relevant evidence is admissible. Rule 403 allows the district court to exclude evidence if the danger of unfair prejudice substantially outweighs the probative value of the evidence. Rule 403 is an extraordinary remedy which the district court should invoke sparingly. *United States v. Finestone*, 816 F.2d 583, 585 (11th Cir.), *cert. denied*, 484 U.S. 948, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987). The balance under Rule 403 should be struck in favor of admissibility. *United States v. Norton*, 867 F.2d at 1361. In determining whether the district court erred in failing to exclude relevant evidence under Rule 403, this Court must give deference to the discretion of the district judge. *United States v. Howard*, 855 F.2d 832, 837 (11th Cir.1988). On appeal, this Court should look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact. *Finestone*, 816 F.2d at 585. The district court's admission of evidence will be reversed only upon a clear showing of abuse of discretion. *United States v. Russell*, 703 F.2d 1243, 1249 (11th Cir.1983).

Defendant did not object under Rule 403 to the admission of this evidence at trial, although defendant did object that the documents were improperly authenticated. Consequently, this error, if any, is reviewed for plain error. *See* Fed.R.Crim.P. 52(b). "Plain error consists of error which, when examined in the context of the entire case, is so obvious that failure to notice it would substantially affect the fairness, integrity and public reputation of judicial proceedings." *Russell*, 703 F.2d at 1248. This Court will reverse defendant's conviction for plain error only if the erroneous admission of evidence seriously affected substantial rights of the defendant. *United States v. Cortez*, 757 F.2d 1204, 1207 (11th Cir.), *cert. denied sub nom. Mar-*

*tinez–Valdez v. United States*, 474 U.S. 945, 106 S.Ct. 310, 88 L.Ed.2d 287 (1985).

██ The district court did not err in admitting these letters. We emphasize that the level of prejudice we consider is the level of *unfair* prejudice. *United States v. Norton*, 867 F.2d at 1362. The documents were relevant to show Badir's intent that the planes would go to Libya. The unfair prejudice to defendant was limited, because there was nothing in either document connecting defendant directly to the Libyan military. Even if defendant is correct in arguing that the district court erred in admitting these two documents under Rule 403, he would not be entitled to relief under the plain error standard. Defendant failed to show any significant unfair prejudice, much less the level of unfair prejudice necessary for a finding of plain error.

## 2. Rule 804(b)(5)

Defendant argues that the district court erred in admitting the Jabir letter under Fed.R.Evid. 804(b)(5). Rule 804(b)(5) provides for admission of hearsay evidence having circumstantial guarantees of trustworthiness if "(A) The statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence." [7]

██ We conclude that the district court correctly found that the government satisfied the elements required for admission of the Jabir letter under Rule 804(b)(5). The presence of corroborating evidence that these planes were destined for use in Libya by the Libyan armed forces provides circumstantial guarantees of the trustwor-

thiness of the letter. *See United States v. Chapman*, 866 F.2d 1326, 1332 (11th Cir. 1989). The official stationery and its presence in Badir's briefcase also constitute circumstantial guarantees of trustworthiness. The letter is clearly material, indicating as it does the direct involvement of high Libyan officials in the purchase of these planes. The letter, authored by Jabir, was more probative than any other information reasonably available to indicate that the Libyan military participated in the purchase of these planes. We conclude that the district court did not err in admitting this letter.[8] Even if this letter had been erroneously admitted, however, we would not reverse defendant's conviction, because we conclude that the admission would have constituted harmless error. *See* Fed.R.Crim.P. 52(a).

## 3. Authentication

██ Defendant challenges the use of circumstantial evidence to authenticate the letters under Fed.R.Evid. 901(a). Use of circumstantial evidence alone to authenticate a document does not constitute error. *United States v. Caldwell*, 776 F.2d 989, 1001–03 (11th Cir.1985). There is no evidence of adulteration or forgery; thus, there is no reasonable probability of misidentification. *See* Fed.R.Evid. 901(a) (authentication is sufficient if it supports a finding that "the matter in question is what its proponent claims"); *United States v. Shabazz*, 724 F.2d 1536, 1539 (11th Cir. 1984). Fed.R.Evid. 901(a) requires only some competent evidence in the record to support authentication. *United States v. Koziy*, 728 F.2d 1314, 1321 (11th Cir.), *cert. denied*, 469 U.S. 835, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984). The government introduced evidence that these documents were indeed what the government claimed them to be. We conclude that the district court

---

**7.** A preliminary requirement is that the declarant be unavailable. *See* Fed.R.Evid. 804(a)(5). Defendant first argues that the government could have obtained the presence of Badir, and that therefore the declarant was not unavailable. This argument fails for the simple reason that Jabir and not Badir was the declarant. There is no argument that Jabir, the head of the

Libyan military forces, was reasonably available to the government.

**8.** Although the government does not make this argument, this letter may also have been admissible as a co-conspirator statement. *See* Fed.R.Evid. 801(d)(2)(E).

did not err in finding that the government had properly authenticated the documents.

### 4. Expert Testimony

Defendant claims that the district court erred in admitting hearsay evidence on the identity of Jabir. In attempting to prove that Jabir was the head of the Libyan military, the government called an expert in Libyan history, George Schuler. Schuler testified that Jabir had been announced in the Libyan press in 1970 as commander-in-chief of the Libyan armed forces, and that Jabir was still commander-in-chief at the time the letter was written.

■■■ The district court has broad discretion in admitting or excluding expert testimony. The district court's ruling qualifying Schuler as an expert and admitting this evidence will not be reversed unless manifestly erroneous. *United States v. Brown*, 872 F.2d 385, 392 (11th Cir.1989); *United States v. Sans*, 731 F.2d 1521, 1530 (11th Cir.1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 791, 83 L.Ed.2d 785 (1985). Testimony based on hearsay is inadmissible as a general rule, whether offered by an expert or by a lay person. *United States v. Cox*, 696 F.2d 1294, 1296–97 (11th Cir.), *cert. denied*, 464 U.S. 827, 104 S.Ct. 99, 78 L.Ed.2d 104 (1983). Fed.R.Evid. 702 allows an individual to be qualified as an expert based on knowledge, experience, and education, and an expert can testify based on his knowledge and experience. Fed.R. Evid. 703; *see United States v. Bagnell*, 679 F.2d 826, 833–34 (11th Cir.1982), *cert. denied*, 460 U.S. 1047, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983). Once qualified as an expert in Libyan affairs, Schuler could give his opinion about who Jabir was. His testimony could include hearsay that formed the basis of that opinion. *See United States v. Ramos*, 725 F.2d 1322, 1324 (11th Cir.1984). The weakness of the basis for his opinion that Jabir was the head of the Libyan military goes to the weight rather than to the admissibility of Schuler's opinion. *See Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir.1988).

■■■ We need not decide whether the district court erred in admitting Schuler's testimony. In order to be entitled to relief from the erroneous admission of evidence, defendant must show prejudice to substantial rights. *See* Fed.R.Crim.P. 52(a). Defendant, however, does not claim prejudice from the introduction of this testimony. For example, defendant does not argue that Jabir is not in fact the commander-in-chief of the Libyan military. We conclude that the introduction of Schuler's testimony does not constitute reversible error.

### 5. Transcript of Tape Recording

■■■ A tape recording of a conversation between defendant and co-defendant Burnham that occurred at Atlanta's Hartsfield Airport on June 27, 1985, was introduced into evidence by the government. At the end of the tape, the individuals making the recording questioned whether defendant was actually involved in the plan to sell these planes to Libya. This trailer portion of the tape was not introduced into evidence. Instead, defendant's counsel cross-examined Boggess, the recording person, regarding his impression of the level of defendant's involvement in the plan. During its deliberation, the jury requested that the tape-recorded conversation be replayed. The trial judge allowed the tape to be replayed, but refused to allow the jury to listen to the trailer portion of the tape. Defendant argues that this decision constitutes reversible error.

The district court did not err in refusing to allow the jury to consider the trailer portion of the tape. The "trailer" portion of the tape was a recording of a conversation between the individuals who made the tape; it was not a part of the taped conversation between the defendant and co-defendant Burnham. It was not up to the individuals who made the tape to make any judgment as to Elkins' involvement in the conspiracy to sell the planes to Libya. That judgment, as the trial judge properly recognized, was for the jury. That portion of the tape had never been admitted into evidence at trial. No exception to the general rule that the jury cannot consider evidence not introduced into evidence at trial applies in this case. *Compare United*

States v. Pendas–Martinez, 845 F.2d 938, 943–45 (11th Cir.1988) *with United States v. Le Fevour,* 798 F.2d 977, 981 (7th Cir. 1986).

### D. *Prosecutorial Misconduct and Judicial Intervention*

Defendant argues that the prosecutor committed reversible error by giving an inaccurate opening statement and by allowing misleading testimony to be presented to the jury. Defendant also argues that the district judge unfairly interjected himself into the case. Defendant claims that the combination of judicial and prosecutorial misconduct deprived him of a fair trial.

 A conviction will be reversed on the basis of prosecutorial misconduct if that misconduct is so pronounced and persistent as to "permeate the entire atmosphere of the trial." *United States v. McLain,* 823 F.2d 1457, 1462 (11th Cir. 1987). The focus is on whether the prosecutor's misconduct deprived the defendant of a fair trial. *See generally Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). In a similar vein, objective demeanor on the part of the trial judge is crucial to a fair trial, although the judge may within reasonable limits remark on the evidence presented and when appropriate curtail further introduction of evidence. *United States v. Bertram,* 805 F.2d 1524, 1529 (11th Cir.1986); *see also United States v. Cortez,* 757 F.2d at 1208. The combination of prosecutorial misconduct and improper judicial conduct can, in an extreme case, deny a defendant a fair trial. *See, e.g., McLain,* 823 F.2d at 1462.

In his opening statement, the prosecutor told the jury that members of the Libyan Air Force had defected to Egypt in one of the Lockheed L–100–30 airplanes. The government intended to call Egyptian officials to prove this fact. During trial, however, the Egyptian government refused to cooperate, and the prosecutor was not able to prove at trial that this statement was true. Defendant argues that this misstatement in opening argument constitutes prosecutorial misconduct mandating reversal of his conviction.

 Defendant did not object to the statement or move for a mistrial at the close of evidence at trial. Consequently, this error must be reviewed under a plain error standard. Fed.R.Crim.P. 52(b). *See United States v. Walther,* 867 F.2d 1334, 1341 n. 3 (11th Cir.1989); *United States v. Odom,* 858 F.2d at 667. The plain error rule should be used sparingly, and a conviction should be reversed only if "a miscarriage of justice would otherwise result." *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d (1985). Whether or not it may have been improper to refer in an opening statement to evidence that was never ultimately introduced at trial, this error does not require reversal, *see, e.g., United States v. Sawyer,* 799 F.2d 1494, 1507 (11th Cir.1986), *cert. denied,* 479 U.S. 1069, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987) (not plain error to refer to confession that was never introduced at trial), particularly because there was no indication of bad faith. *See United States v. Gray,* 730 F.2d 733, 834–35 (11th Cir.1984).

Defendant argues that the government introduced misleading testimony by a critical witness, Lilly. Lilly testified that the government had not made any promises that he would not be subject to prosecution. In fact, the government never did prosecute Lilly. Defendant relies on the fact that the time for prosecuting Lilly under the Speedy Trial Act expired during defendant's trial to argue that the government never intended to prosecute Lilly, that Lilly knew this, and that therefore Lilly's statement that there was no deal was prejudicially misleading to the jury.

 The government has the duty to disclose agreements with prosecution witnesses and to disclose false testimony presented by prosecution witnesses. *See Brown v. Wainwright,* 785 F.2d 1457, 1465 (11th Cir.1986). Lilly's statement even by the defendant's own argument is not misleading, however. At a hearing held before the district court, attorneys for the government testified regarding their decision not to prosecute Lilly. The attorneys testified that at the time of his testimony,

the government had not decided whether or not to prosecute Lilly. Lilly's testimony, that there was no deal at the time of trial, was true. Defendant does not argue that the government failed to disclose an actual agreement with the defendant. *See United States v. Lacayo*, 758 F.2d 1559, 1562–63 (11th Cir.), *cert. denied*, 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985) (agreement granting leniency to witness must be reached prior to trial to be subject to disclosure). Therefore, there was no fact disclosed or not disclosed that would have misled the jury. *Compare Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972) ("[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' ") (quoting *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935)). We conclude that defendant has not demonstrated any prosecutorial misconduct justifying a reversal of his conviction.

 Defendant argues that the district court displayed a lack of neutrality that denied him a fair trial. Defendant does not identify any particularly egregious conduct by the district judge that would mandate a reversal of his conviction. Certainly the judge did not intervene to the extent of indicating his personal feelings about guilt or innocence. *See United States v. Robinson*, 687 F.2d 359, 361 (11th Cir.1982). The judge did have the discretion to control admission of evidence and to comment on that evidence. *See Bertram*, 805 F.2d at 1529; *Cortez*, 757 F.2d at 1208. We conclude that defendant has not demonstrated any misconduct on the part of the trial judge that mandates reversal of his conviction.

### E. *Requested Jury Charge*

Defendant challenges the district court's refusal to give a requested jury instruction. Defendant requested the judge to instruct the jury that the defendant should be acquitted if defendant reasonably believed that Lockheed knew of the Libyan connections with Contrust and had informed the Department of Commerce about those connections.

 In reviewing jury instructions, this Court must evaluate whether the entire charge, taken as a whole, adequately presented the issues and the law to the jury. *United States v. Italiano*, 837 F.2d 1480, 1487 (11th Cir.1988). The trial judge has broad discretion in formulating a jury charge, and will not be reversed unless the charge does not correctly state the substance of the law and the facts. *United States v. Chapman*, 866 F.2d at 1334; *United States v. Hewes*, 729 F.2d 1302, 1316 (11th Cir.1984), *cert. denied sub nom. Caldwell v. United States*, 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985). The defendant, however, is entitled to instruction on any valid defense that has an evidentiary foundation. *See United States v. Fernandez*, 837 F.2d 1031, 1035 (11th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 102, 109 S.Ct. 102, 102 L.Ed.2d 78 (1988).

 The defense defendant attempted to assert was good faith reliance on Lockheed. Defendant acknowledged at trial, however, that Lockheed lacked full knowledge of the facts. Thus, even if this constituted a valid defense, defendant was not entitled to his requested instruction, because this defense lacked an evidentiary foundation. *See United States v. Parker*, 839 F.2d 1473, 1482 n. 6 (11th Cir.1988).

### F. *Eighth Amendment Challenge to Sentence*

#### 1. Imprisonment

 In *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the Supreme Court held that grossly disproportionate sentences can violate the Eighth Amendment. Federal courts thus must conduct a proportionality review of sentences imposed. *See Marrero v. Dugger*, 823 F.2d 1468, 1473 n. 7 (11th Cir. 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1235, 1247, 99 L.Ed.2d 434 (1988). This proportionality review is extremely limited: "As the Supreme Court made clear in *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), it is not normally the

role of an appellate court to second-guess the trial judge's determination of an appropriate sentence. Rather, an appellate court must determine only whether the sentence imposed is so grossly disproportionate to the crime as to constitute cruel and unusual punishment." *United States v. Darby,* 744 F.2d 1508, 1525 (11th Cir.1984), *cert. denied sub nom. Yamanis v. United States,* 471 U.S. 1100, 105 S.Ct. 2322, 2323, 85 L.Ed.2d 841 (1985). In conducting this proportionality review, this Court must evaluate three elements: (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; and (3) the sentences imposed for commission of the same crime in other jurisdictions. *Solem v. Helm,* 463 U.S. at 292, 103 S.Ct. at 3010; *see also United States v. Holmes,* 838 F.2d 1175, 1178 (11th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 2829, 100 L.Ed.2d 930 (1988).

 Defendant was sentenced to five years' imprisonment on the conspiracy conviction, and to a consecutive term of ten years' imprisonment and a $6.6 million fine on the export control violation conviction. Defendant also received a special assessment of $50 on each count. Defendant eventually makes one argument that his sentence violated the Eighth Amendment: "Because the harshness of Appellant's sentence far exceeds the sentences imposed in similar export prosecutions in the Northern District of Georgia and elsewhere, Appellant respectfully submits this Court should conclude that his sentence is unconstitutionally disproportionate." A sentence is disproportionate for Eighth Amendment purposes if the punishment is grossly disproportionate when compared with the nature of the crime. In *Solem v. Helm* itself, for example, the Court held that a life sentence without possibility of parole for a non-violent, minor offense violates the Eighth Amendment.

In a variety of situations, life sentences with the possibility of parole have been held not to violate the Eighth Amendment. *See, e.g., Rummel v. Estelle,* 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382

(1980) (obtaining $120.75 by false pretenses); *Williams v. Johnson,* 845 F.2d 906 (11th Cir.1988) (forgery). These sentences, five years for conspiracy and ten years for violating export control laws, certainly are not grossly excessive compared to the nature of the crime. Additionally, the ten-year sentence imposed for violating export control regulations is not grossly disproportionate to the sentences imposed in other federal jurisdictions for violations of the same federal laws. Defendant unlawfully sold $57 million worth of high technology aircraft equipment to an unfriendly nation. Although his sentence may have been longer than the sentences normally imposed for this offense, that fact alone does not mean it was grossly disproportionate within the meaning of *Solem.*

2. Fine

 Defendant also challenges the fine imposed on count two. There may be circumstances where an excessive fine constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Cf. United States v. Monroe,* 866 F.2d 1357, 1366–67 (11th Cir.1989). We need not identify those circumstances in this case. Defendant made a gross profit of $13,049,474, a net profit of $7,336,233, and an after-tax profit of $3,368,917 from the sale of these aircraft. Defendant's fine of $6.6 million was less than his gross profit and less than his net profit from the sale of these planes. Although a large amount, we hold that a fine representing an amount less than the net profit of an illegal transaction does not violate the Eighth Amendment absent a showing of severe, particularized hardship suffered by defendant.

 Defendant also argues that this fine exceeds the maximum prescribed by law. We disagree. Violation of the export control laws generally results in fines up to $250,000. *See* 50 U.S.C.A. § 1705(b); 50 U.S.C.App. § 2410(b)(1)(B); 15 C.F.R. § 387.1(a)(1)(ii). Under 50 U.S.C.App. § 2410 and 15 C.F.R. § 387.1, however, the district court could have imposed a fine up to five times the value of the exports. Defendant argues that those sections do not

apply, because in extending the Export Administration Act, the President declared by Executive Order No. 12470 that 50 U.S.C. §§ 1702(b)(2) and 1705 were to control over inconsistent provisions concerning punishment. The Executive Order stated that section 1705 "shall control over any inconsistent provisions in the regulations which respect to ... civil and criminal penalties for violations subject to this Order." The Executive Order, however, by its express language did not overrule the penalty provision of section 2410, because that statute is not a provision in the regulations. The value of the planes and parts exceeded $57 million. Consequently, we conclude this fine was well within the statutory maximum.

Even if section 2410 did not apply, this fine does not exceed the maximum allowed by law. Title 18, U.S.C.A. § 3623(c)(1), *repealed* effective November 1, 1987, Pub.L. No. 98–473, applies to fines for crimes committed after December 31, 1984, and before November 1, 1987. *See United States v. Slovacek,* 867 F.2d 842, 849 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 2441, 104 L.Ed.2d 997 (1989); *United States v. Henson,* 848 F.2d 1374, 1385 (6th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 784, 102 L.Ed.2d 776 (1989). The relevant acts in this case were committed in the spring of 1985, and therefore section 3623 is applicable. Section 3623 allows a fine greater than the amount specified in the statute. *See generally United States v. Cha,* 837 F.2d 392, 394 (9th Cir. 1988); *United States v. Holmes,* 822 F.2d 481, 495 (5th Cir.1987). Defendant could have been fined twice the gross gain from the sale of the planes, unless imposition of such a large fine would have unduly complicated or prolonged the sentencing process. 18 U.S.C.A. § 3623(c)(1). This fine was less than the amount defendant earned as a gross profit on the sale, and is well within the limits of section 3623. Consequently, we conclude that this fine does not exceed the maximum fine allowed for this offense.

Defendant argues that the district court did not consider the impact of this fine on his family. *See* 18 U.S.C.A. § 3622(a)(4), *repealed,* Pub.L. No. 98–473. This argument has no merit. That information was before the district court, and the transcript indicates that the court considered these factors.

## III. CONCLUSION

Defendant's convictions and sentence are AFFIRMED.