[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 27, 2006
THOMAS K. KAHN
CLERK

No. 04-12837

_____

D.C. Docket No. 02-00078-CR-FTM-29DNF


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,


versus

JACK PENTZ,

                                        Defendant-Appellant.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(October 27, 2006)**

Before EDMONDSON, Chief Judge, HILL and KRAVITCH, Circuit Judges.

PER CURIAM:

This is an appeal from a judgment following a jury trial finding appellant Jack Pentz guilty of two counts of wire fraud in violation of 18 U.S.C. § 1343 (counts one and three); two counts of engaging in monetary transactions in criminally derived property in violation of 18 U.S.C. § 1957 (counts four and six); and two counts of money laundering in violation of 18 U.S.C. § 1956 (counts seven and eight).[1] The district court adjudicated Pentz's guilt and imposed a sentence of 60 months on counts one and three; 120 months on counts four and six; and 151 months on counts seven and eight, all to run concurrently. Pentz also received three years of supervised release and was ordered to pay $5,285,779 in restitution. On appeal, Pentz alleges numerous trial errors, including prosecutorial misconduct and various sentencing errors. Based upon the following, with one sentencing exception to be remanded for resentencing, the judgment of the district court is affirmed.[2]

---

[1] By motion of the government, one count of wire fraud and one count of engaging in monetary transactions in criminally derived property were dismissed by the district court.

[2] The government concedes, and we accept the concession, that the district court erred in increasing Pentz's offense level under U.S.S.G. §3B1.1, finding that Pentz had been an organizer, leader, manager or supervisor of Cathy Fraser, an employee of Waterford Mortgage Corporation (WMC), in money laundering activity as the evidence failed to prove that Fraser had engaged in money laundering. This case is to be remanded for the district court to determine the correct offense level under the advisory sentencing guidelines, without an upward adjustment under Section 3B1.1, and to consider what, if any, impact this adjustment will have on Pentz's sentence.

I.

We set forth only those facts that are relevant to the trial error and sentencing error issues raised in this appeal. Pentz and partner Laurie Smith formed Waterford Mortgage Corporation (WMC) in 1991 to broker residential mortgage loans for several lenders. WMC entered into a series of lending agreements with investor Ronald L. Brown, in which Brown agreed to provide WMC with a line of credit, eventually up to $15 million.[3]

The superceding indictment alleged that, on or about January 1996, Pentz and others devised a scheme to defraud Brown by obtaining, under false pretenses, monies that were intended by Brown to fund and to be secured by residential mortgages. The allegations at trial were that WMC defrauded Brown by assuring him that the line of credit he provided was soundly secured by specific real estate mortgages held by WMC, when in fact, such mortgages had already been resold to other unrelated financial institutions.[4] At trial, Pentz denied knowing that Brown had been given fictitious mortgages.

---

[3] When Ms. Smith died in 1998, Pentz exercised an option to purchase WMC from her estate, and formed a new corporation, First Mortgage of Naples, d/b/a/ Waterford Mortgage Bank (First Mortgage).

[4] At the outset of civil litigation filed by Brown, a court appointed receiver took control of WMC and First Mortgage, and possession of several pieces of real estate titled to First Mortgage, including a large undeveloped piece of property in Tennessee.

The government alleged that, unknown to Brown, Pentz lost approximately $2.3 million in overseas investments in a foreign bond trading investment to which he had been introduced by Earl Abbott. Abbott testified at trial that when Pentz learned of the loss, he told Abbott that if he did not get his money back by Friday, Abbott would not live to see the sun come up on Monday, and made other similar threats against Abbott's wife and children. The government also alleged that between 1998 and 2000, Pentz used WMC funds for vacations, plastic surgery, jewelry, clothing, appliances, animal care, dentistry and other personal expenditures.

In opening statement, government counsel remarked that "Ms. Smith died, Cathy's sister, the original partner of Mr. Pentz died mysteriously in California in the Spring of 1998. Her death was ruled a suicide by local authorities there." The defense objected, moved for mistrial, and the district court denied the motion. No evidence as to the circumstances of Ms. Smith's death was presented at trial. However, in closing argument, government counsel stated that "if they [Pentz and Smith] continued to be hardworking, you know Jack Pentz's life would be very different today, I suggest to you that Laurie Smith would be alive today."

At sentencing, the Presentence Report (PSR) stated that Brown had been induced to provide monies to fund mortgages from at least 1993. The probation

office calculated the loss under an actual loss theory of $8 million. It imposed a two-level role adjustment under U.S.S.G. § 3B1.1(c), maintaining that Pentz was an organizer, leader, manager or supervisor during the conduct constituting the basis for the money laundering count. *See* n. 2 *supra*. It also imposed a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1, based upon false testimony provided by Pentz at trial, and a two level enhancement for an offense committed by sophisticated means under U.S.S.G. § 2B1.1(b)(8).

## II.

Pentz raises seven issues on appeal. We discuss only two: (1) whether there was prosecutorial misconduct, error or impropriety sufficient to warrant a new trial for Pentz; and (2) whether the district court erred under the sentencing guidelines in its fraud and restitution calculations.[5]

---

[5] As stated in note 2 *supra*, it has been conceded and accepted that the district court erred in imposing an aggravating role enhancement under U.S.S.G. § 3B1.1.

In addition, we have thoroughly reviewed the issue as to whether the government's inadvertent viewing of a spreadsheet prepared by Pentz for his attorney's use in litigation violated Pentz's attorney-client privilege. We find that the government had already anticipated the defense that Pentz claimed to have been revealed by the spreadsheet. We find no error and this issue is affirmed without further discussion.

Based on the ample amount of supporting evidence, we also conclude that the district court properly instructed the jury on the concept of deliberate ignorance. This issue is affirmed without further discussion.

Pentz argues for the first time that the district court erred under *Booker* in sentencing him in the mistaken belief that the United States Sentencing Guidelines were mandatory and in imposing sentencing enhancements based upon judicial fact-finding. Under a plain error standard, we have reviewed the record and find that Pentz has not shown resulting prejudice to his substantial rights or any detriment to the judicial proceedings. This issue is affirmed without

## III.

We review the district court's denial of Pentz's motion for mistrial and new trial for abuse of discretion. *See United States v. Mendez*, 117 F.3d 480, 484 (11th Cir. 1997). In reviewing a claim of prosecutorial misconduct, we consider whether (1) the challenged statements by the prosecutor are improper, and (2) if so, did they prejudicially affect the defendant's substantial rights. *See United States v. Obregon*, 893 F.2d 1307, 1310 (11th Cir. 1990). In reviewing such a claim, this court must review it against the entire record, and reverse a conviction only if the challenged statement(s) resulted in an unfair trial and a miscarriage of justice. *Id.*

We review a district court's factual findings in determining a sentence for clear error. *See United States v. Sasnett*, 925 F.2d 392, 397 (11th Cir. 1991) (including its calculation of the amount of loss); *United States v. Goldberg*, 60 F.3d 1536 (11th Cir. 1995) (including its finding as to the amount of restitution to be awarded a victim).

## IV.

*A. Prosecutorial Misconduct*

On appeal, Pentz claims that he was denied a fair trial. Asserting a cumulative impact and effect, he contends that the prosecutor engaged in improper

---

further discussion.

conduct and that the district court erred in evidentiary rulings.

Pentz claims that the trial turned upon the jury's assessment of his credibility and that he was unfairly prejudiced by evidence of "character assassination," designed solely to undermine his credibility. We examine his claims in three areas we deem relevant: (1) by the prosecutor in opening statement, referring to Ms. Smith's death in California under mysterious circumstances; (2) by the prosecutor in closing argument, that had Pentz and Smith lived their lives differently, perhaps Ms. Smith would be alive today; (3) by the admission of testimony by Abbott referring to death threats allegedly made by Pentz against Abbott and his wife and children; and (4) by references to Pentz's lavish personal spending.

*Opening Statement and Closing Argument*

After opening statement, the district court denied Pentz's motion for a mistrial on the ground that government counsel's comment about Smith's mysterious demise implied that Pentz had been responsible in some way for Smith's death. The same thing occurred after closing argument.

Improper remarks by a prosecutor may be the basis of relief for a defendant. *See United States v. Chirinos*, 112 F.3d 1089, 1097 (11th Cir. 1997). However, a conviction can be reversed on the basis of prosecutorial misconduct only "if that misconduct is so pronounced and persistent as to 'permeate the entire atmosphere

of the trial.'" *See United States v. Elkins*, 885 F.2d 775, 787 (11th Cir. 1989).

The government argues that the remarks were not improper; that they did not accuse Pentz of being involved in the death of Smith; that they could not have been interpreted as doing so; and that Smith's suicide was intrinsically intertwined with the events of Pentz's crimes. In the alternative, the government argues that, even if improper, these statements were harmless in the context of all the evidence and did not render Pentz's trial unfair.

The government does not persuade us that these statements were not improper. They related to nothing material to the case. In making these remarks, the government's trial attorney trod dangerously close to spoiling a conviction. Our detailed review of the entire record persuades us that, though ill-advised and less than acceptable conduct, these remarks were not so persistent as to "permeate the entire atmosphere of the trial." *Elkins*, 885 F.2d at 787. The district judge did not abuse his discretion in finding them not so pronounced and persistent as to require a new trial.

*Abbott Testimony and Lavish Spending*

During cross examination of Pentz, he was asked to affirm that he had threatened to kill Abbott unless Abbott reimbursed Pentz for the money lost in the foreign investments. Objection was overruled. Abbott was called in rebuttal and

affirmed the threat.

We agree with the government that the threats were relevant and material. They indicated Pentz's growing desperation as he lost money in his dealings with Abbott and were properly used by the government to impeach him as a defendant who denies wrongdoing in his testimony. *See United States v. Plotke*, 725 F.2d 1303, 1309 (11th Cir. 1984). As to relevance and materiality, we also find no error with respect to lavish spending references set forth in the trial transcript.

*B. Sentencing Errors Alleged on Appeal*

On appeal Pentz claims that the district court committed three sentencing errors in calculating the $8,115,089 amount of the fraud loss and in imposing a $5,285,779 restitution award: (1) that the district court erred in using an actual loss formula dating back to 1993, instead of an intended loss formula, dating only back to 1996; (2) that the district court erred in relying on unreliable and incomplete financial records; and (3) that the district court erred in failing to credit Pentz's pledged collateral amounts as credits used against the loss provision under U.S.S.G. § 2B1.1 of the sentencing guidelines.[6]

The government responds that the district court did not clearly err because:

---

[6] Pentz argues that the auditing agent conceded that the calculation was a reconstruction, that the entire necessary records were not available, and it was necessary to use many different sources in order to prepare the reconstruction.

(1) Pentz took deliberate steps to prevent Brown from recovering any assets when he sold the bulk of WMC's mortgage notes after Smith died; (2) Pentz caused the title to assets WMC obtained through fraudulent means to be placed in the names of other entities; (3) Pentz tricked Brown into assigning all of his collateral in another corporation in exchange for a worthless promissory note; and (4) as Pentz moved all collateral out of Brown's reach, the credits against loss provision of U.S.S.G. § 2B1.1 does not apply.  It claims that the district court correctly computed the intended loss as the difference between what Brown disbursed to WMC and what WMC repaid Brown.  The district court then reduced the correct intended loss figure by the amount recovered in determining the restitution amount.

The district court's fraud loss calculation is a factual determination that we review for clear error.  *See United States v. Renick*, 273 F.3d 1009, 1025 (11th Cir. 2001).  When a defendant contests the amount of loss, the government bears the burden of establishing the amount of the loss by a preponderance of the evidence. *See United States v. Dabbs*, 134 F.3d 1071, 1081 (11th Cir. 1998).

Under U.S.S.G. §§ 2S1.1 and 2B1.1, the applicable offense level is determined based on the greater of the actual loss or the intended loss to the victim.  *See* U.S.S.G. § 2B1.1 comment. (n.3(A)).  "Actual loss" means the "reasonably foreseeable pecuniary harm that resulted from the offense[,]" and "'[i]ntended loss'

10

(I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id*.

The district court needs to make only make a reasonable estimate of the loss. Preciseness is not demanded. *See* U.S.S.G. § 2B1.1 comment. (n.3(C)). The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the district court's loss determination is entitled to appropriate deference. *Id.*; *see also United States v. Miller*, 188 F.3d 1312, 1317 (11th Cir. 1999).

The commentary to the sentencing guidelines state that the loss amount should be reduced by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant . . . to the victim before the offense was detected[,] and "[i]n a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." U.S.S.G. § 2B1.1 comment. (n.3(E)).

Brown and Pentz began a business relationship in 1993. The district court calculated the loss by starting with the total amount of money that Brown had

11

loaned WMC pursuant to the lending agreements from 1993 to 2000, and subtracting the amount of money that WMC had paid Brown in return during the same time. Pentz does not dispute that the amount was in excess of $8 million. He argues that the figure incorrectly incorporated amounts loaned and repaid during years in which no fraud allegedly took place, 1993-1996.

The indictment alleged that the scheme to defraud began in or about January 1996 and lasted until April 2000. The government argued at sentencing that the evidence showed that, although the fraud did not start until 1996, losses dating back to 1993 should be considered because: (1) the balances on the earlier loans had not been paid back when the fraud started; (2) the earlier loans were used to induce Brown to provide more money; and (3) the money obtained from Brown by fraud after 1996 was used to pay Brown interest that he was due on the earlier outstanding loans.

We find that even if it is assumed that the fraud did not start until 1996, Pentz still owed Brown more than $3 million in 1996. For the continuation of the fraud, the evidence showed that Pentz paid Brown what Brown believed was principal and interest on mortgages that Pentz never actually funded or that were sold to other institutions. Therefore, under a clear error review, it was reasonable for the district court to include the monies obtained in the earlier years to facilitate

the fraud in the later years.

As to the issue of collateral, there is no clear error in the judgment of the district court that Pentz was not entitled to any credits against loss. The evidence established that Pentz took deliberate steps to prevent Brown from recovering anything at all. Pentz sold the bulk of WMC's mortgage notes and sold them after Smith died; caused title to other WMC assets to be placed in other names; and tricked Brown into assigning all of his collateral to another company in exchange for a worthless promissory note.

WMC and First Mortgage were separate entities with separate tax identification numbers. The lending and security agreements were between Brown and WMC. The collateral owned by First Mortgage was not pledged to Brown nor provided to Brown by Pentz. Therefore any money Brown received or will receive from the disposition of property owned by First Mortgage, and the value of any property still owned by First Mortgage, is not properly a credit against the fraud loss amount. *See* U.S.S.G. § 2B1.1 comment. (n.3(E)). The district court did not clearly err in finding the fraud loss amount to be more than $8 million and the resulting restitution amount to be more than $5 million.

IV.

With the one narrow exception that Pentz's sentence must be vacated and

remanded for re-sentencing in light of the government's concession that the sentencing enhancement under U.S.S.G. § 3B1.1 does not apply, the judgment of conviction is affirmed.

AFFIRMED IN PART; VACATED IN PART; and REMANDED FOR RESENTENCING.