[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-11192

_____

D. C. Docket No. 06-20682-CV-JAL

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 17, 2009
THOMAS K. KAHN
CLERK

TAMBOURINE COMERCIO INTERNACIONAL SA,
a Portuguese corporation,
HAWKSBAY LTD.,
an Isle of Man corporation,

Plaintiffs-Appellants,

versus

JAY H. SOLOWSKY, ESQ.,
an individual residing in Florida,
PERTNOY, SOLOWSKY & ALLEN, P.A.,
a Florida professional association,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 17, 2009)

Before DUBINA, BLACK, and FAY, Circuit Judges.

FAY, Circuit Judge:

This appeal arises out of the allegedly unlawful conduct of an attorney and his law firm with respect to a sum of money they held in trust. Plaintiffs Hawksbay Ltd. ("Hawksbay") and Tambourine Comércio International, S.A. ("Tambourine") sued Defendants Jay Solowsky and his law firm Pertnoy, Solowsky & Allen, P.A.(collectively "Solowsky" or "Defendants"), claiming they unlawfully held Hawksbay's money in trust and also unlawfully dispersed it. At the close of Plaintiffs' case at trial Defendants made a Rule 50 Motion on all claims, which the district court granted. Plaintiffs raise the following issues on appeal: (1) the district court's grant of Defendants' Rule 50 Motion on Hawksbay's conversion and civil theft claims; (2) the district court's grant of Defendants' Rule 50 Motion on Tambourine's breach of fiduciary duty claim; (3) the district court's exclusion of David Turner's documentary and testimonial evidence; (4) the district court's exclusion of the outcome of a related case; and (5) the district court's exclusion of several other pieces of evidence. For the reasons set out below, we reverse on the first and third issues, as well as some of the evidentiary issues.

## I. FACTS

### A. Background

#### 1. Sitindustries: Tambourine and Hawksbay

2

Tambourine and Hawksbay are two subsidiaries of the Italian entity Sitindustrie, S.P.A. ("Sitindustrie"). Sitindustrie manufactures tubes in stainless steel, copper, and nickel alloys. The founder of Sitindustrie, German Bocciolone ("German"), was the CEO until he died in 1993. After German's death, his daughter Antonella Bocciolone ("Antonella") took over as the CEO. In 1997 at the direction of Antonella, Sitindustrie's holding company, Kobarid Holdings, S.A. ("Kobarid") acquired Hawksbay and Tambourine to control Sitindustrie's investments.

Antonella served on the board of both Hawksbay and Tambourine with David Brenman, Tambourine's chief operating officer through 2002. Antonella and Brenman later married in 2000. At their direction, Tambourine lent twenty million dollars to Lionheart International Ltd. ("Lionheart") to be invested. Several months later Tambourine asked for the money back, but only received ten million dollars. Tambourine briefly retained Defendant Pertnoy, Solowsky, & Allen ("PSA") in 1999 to locate the missing ten million dollars - this sum of money was known as the "Lionheart ten million." The Lionheart ten million, however, is not part of this litigation.

In 1998, Tambourine entered into a Management Agreement with Edward Reizen, a self proclaimed fund management expert. Tambourine agreed to pay

Reizen four hundred thousand dollars annually to manage Tambourine's assets. The Management Agreement gave Reizen full authority to act for Tambourine.

In March 1999, Antonella and Brenman appointed Reizen to the Hawksbay board. Reizen was designated as the manager of Hawksbay's bank accounts and given the authority to transfer and invest Hawksbay's funds. At Antonella and Brenman's direction, Tambourine also lent the ten million dollars it did receive back from Lionheart to Hawksbay - this sum of money was known as the "Hawksbay ten million." From 1999 to 2002 Reizen allegedly interacted with numerous financial institutions as Hawksbay's representative. He was later removed as a board member in November 2002.

In 2000, after learning from the Sitindustrie financial manager that there was financial stress, Antonella's younger brother Fausto Bocciolone ("Fausto") began to look for the twenty million dollars managed by Tambourine and Hawksbay. After getting the cold shoulder from Antonella and Brenman, Fausto secretly copied documents concerning the money from Brenman's office. Fausto brought his concerns to the rest of the Bocciolone family and Antonella subsequently resigned as CEO in 2001. She was replaced by Fausto. Antonella and Brenman were later removed as Hawksbay directors in November 2002 and Fausto was appointed as a director of both Hawksbay and Tambourine. Fausto is currently the

4

CEO of Sitindustrie.

In December 2002 the Hawksbay loan matured, but was never repaid. Sitindustries created a team to look for the missing money in January 2003, including a Swiss lawyer, Yves Auberson. Auberson was able to trace the money for a while, but ultimately could not locate it. Sitindustries subsequently sued Antonella and Brenman in Switzerland and Canada to recover the Hawksbay ten million. That suit is not part of this case.

## 2. The Hawksbay Ten Million

In their brief, Defendants lay out the transfers of the Hawksbay ten million from 1998-2002. In 1999 the entire sum was transferred to IHAG Bank in Zurich. In 2000 the funds were combined with monies in which Reizen had an interest and used to purchase Powell Portfolio, Inc., BVI ("Powell") bearer shares. These shares were held in a UBS account and then transferred to the Avenin Group Ltd., BVI ("Avenin") where they were pooled in a one hundred million dollar investment.[1] The proceeds from the sale of the Avenin Note were sent to the Canadian Brokerage Firm, Pentstone Investment, and then to Walter Schumacher's client account in Switzerland in 2001. Hawksbay's lawyer, Auberson, was able to

---

[1] These transactions were facilitated by a Swiss lawyer, Walter Schumacher. Schumacher pooled Hawksbay's funds with the resources of a number of his clients to invest in Avenin.

5

trace the funds to the Avenin account, but subsequently lost the trail. Auberson looked, but did not find any funds in the Swiss banks, Schumacher's account, or in Canada.

The parties dispute what happened to the money next. Hawksbay asserts that the funds in Schumacher's client account were then transferred by Reizen to Solowsky's Interest on Trust Account in October 2006 - the funds transferred to Solowsky's trust account are discussed in detail below. Defendants, however, claim that after the funds were moved to Schumacher's account the trail goes cold and that there is no evidence to link the funds in Switzerland with the funds Reizen transferred to Solowsky's IOTA account.

### 3. Reizen's Transfer to Solowsky

On October 16, 2003, Reizen transferred six million dollars from a Deming Finance Ltd. account to a PSA client trust account known throughout this litigation as the "IOTA Account." "Hawksbay/Brenman" was written on the transfer documentation.

Reizen testified that he told Solowsky he had full authority over the funds and signed an engagement letter representing and warranting that he had:

> full and complete authority over and to the funds which we are holding in escrow, including the right to pay for legal defense in the above-referenced actions and any related actions which may be filed, and that, to your

6

> knowledge, your authority has not been revoked, suspended or repudiated in any way.

(Jt. Ex. 6.) Reizen further testified that he told Solowsky the transfer was intended to facilitate a settlement of the Bocciolone family dispute and that he (Reizen) believed he was entitled to over two million dollars of the funds under the Management Agreement. Reizen testified that Solowsky read the Management Agreement before he agreed to accept the funds.

On October 21, 2003 Reizen sent Solowsky the first authorization for disbursal of the funds from the IOTA account. The authorization identified the funds to be disbursed as the funds from the Sitindustrie/Brenman Settlement. As per Reizen's instructions, Solowsky distributed over three hundred and fifty thousand dollars. The money went to two companies, which Reizen testified that he used to make payments to himself, and to PSA as a retainer. On October 24, 2003 Solowsky transferred $5.5 million from the IOTA account to an interest bearing account at Gibraltar Bank.[2] Over the next three years, upon Reizen's written request, Solowsky disbursed over four million dollars from the trust accounts. These disbursals were all either made for Reizen's benefit or to PSA. Reizen's written requests all referred to the funds in connection with one or all of

---

[2] We refer to this money, as well as the money in the IOTA account, as being held in trust.

7

the following: Sitindustries, Hawksbay, Brenman, Kobarid, and Tambourine.

### 4. The Solowsky-Weiss Discussions

In 2003, Fausto hired Joel Weiss, a lawyer in New York, to try and locate the Hawksbay ten million. Weiss contacted Solowsky in Spring 2003 because Solowsky had represented Tambourine in its 1999 attempt to locate the Lionheart ten million. Solowsky told Weiss that he was owed money by Antonella and Brenman. Hawksbay paid Solowsky the money owed and Solowsky sent Weiss his file on the Lionheart ten million.

On October 23, 2003, at Reizen's request, Solowsky called Weiss. Weiss testified that Solowsky told him that in exchange for indemnification and releases, his clients could assist Hawksbay in finding a substantial amount of Hawksbay's missing money. Solowsky did not tell Weiss that Reizen had transferred six million dollars into his account a few days earlier.

After discussions with his clients, Weiss called Solowsky on October 31, 2003 and secretly taped the phone conversation. A transcript of the recording was introduced into evidence as Plaintiffs' Exhibit 7. Weiss began by telling Solowsky that Hawksbay wanted to recover its missing money and asked Solowsky what he had in mind. Solowsky explained to Weiss that the ten million dollars had been whittled down to five million dollars and change. Solowsky then offered that in

8

exchange for indemnification and releases his clients could obtain the five million and change for Hawksbay in ninety to one hundred and twenty days. Solowsky also asked Plaintiffs to stop looking for the money in the meantime. Weiss then asked Solowsky if he knew where the five million dollars was currently. Solowsky told Weiss three times that he did not know. Weiss ended the conversation by saying that he would convey Solowsky's offer to his clients. Solowsky and Weiss also communicated by letter on November 21, 2003 and December 10, 2003. Fausto declined Solowsky's offer.

Fausto testified that he did not find out Reizen had transferred six million dollars into the IOTA account in October 2003 until December 2005.

### 5. The Kobarid Litigation

What became of the Hawksbay ten million and whether Reizen misappropriated it was the subject of another Southern District of Florida case, Kobarid Holding, S.A., et al. v. Reizen, Case No. 03-23269 ("Kobarid"). In that case, the following entities sued Reizen to recover the Hawksbay ten million: Kobarid, Sitindustries, Tambourine, and Hawksbay. The defendants in this case served as defense counsel for Reizen in Kobarid until they were disqualified, based on their previous representation of Tambourine in 1999. Kobarid was decided on June 14, 2006, when the jury in that case found Reizen liable to Hawksbay for

9

breach of fiduciary duty, fraud, fraudulent concealment, conversion, civil theft, and aiding and abetting breach of fiduciary duty, all on account of his management of the Hawksbay ten million. After a jury verdict in Hawksbay's favor, the court entered final judgment for Hawksbay for over thirty-nine million dollars on June 16, 2006. The jury did not find in favor of any of the other plaintiffs.

On August 9, 2006, Solowsky transferred the remaining $1,456,775.78 in the Gibraltar account to Hawksbay.

### 6. The Instant Case

On March 17, 2006, Plaintiffs Tambourine and Hawksbay filed suit against Defendants Solowsky and PSA over their alleged role in concealing the six million dollars in their trust accounts. In the most recent version of the complaint, Plaintiffs brought the following claims against Defendants: Count I, for civil theft; Count II, for conversion; Count III, for breach of fiduciary duty; and Count IV, for negligent supervision. Plaintiffs also brought a claim for punitive damages.

These claims were eventually whittled down by Defendants' Motion to Dismiss and Motion for Summary Judgment. At trial the only claims remaining were those for civil theft and conversion by Hawksbay, and a breach of fiduciary duty claim by Tambourine.[3] Hawksbay's civil theft and conversion claims allege

---

[3] The court dismissed Hawksbay's claim for breach of fiduciary duty because Hawksbay did not claim to have or to have had an attorney-client relationship with Defendants, whereas

10

that Solowsky misappropriated Hawksbay's funds for his and Reizen's benefit. At issue in Tambourine's breach of fiduciary duty claim was whether Defendants breached their fiduciary duty to Tambourine, a former client, in representing Reizen in related litigation.

## B. Procedural History

At the close of trial in this case, the district court granted Defendants' Rule 50 Motion and dismissed Hawksbay's civil theft and conversion claims, stating that Hawksbay failed to establish its burden of proof. The court held that Hawksbay did not prove that Solowsky knowingly obtained or used Hawksbay's funds; that Solowsky had a felonious intent to deprive Hawksbay of its right to the funds; that Hawksbay had an undisputed right to immediate possession of the six million held in trust; and that the funds in question were specific and identifiable. On this basis, the court entered Judgment as a Matter of Law on Hawksbay's conversion and civil theft claims.

The court also granted Defendants' Rule 50 Motion on Tambourine's breach of fiduciary duty claim based on the two-year statute of limitations for professional malpractice actions. The court stated that Tambourine should have known by

---

Tambourine did claim to have established such a relationship when Defendants represented it in 1999 to locate the Lionheart ten million dollars. The court also dismissed Tambourine's claims for civil theft and conversion because Tambourine did not have any interest in the Hawksbay ten million, as it was merely Hawksbay's creditor.

11

December 2003 that a professional malpractice claim might exist based on a breach of fiduciary duty, but that the claim was time-barred because Tambourine did not file its action until March 17, 2006.  As an additional basis for granting Defendants' Rule 50 Motion on Count III, the district court found that Defendants' representation of Reizen in the Kobarid litigation (which the district court called the "second engagement" of PSA in December 2003) was not substantially related or materially adverse to Tambourine - in other words, the court held *substantively* that Tambourine did not make out a breach of fiduciary duty claim insofar as it was based on Defendants' representation of Reizen in the Kobarid litigation.

## II.  STANDARD OF REVIEW

We review the grant of a Rule 50 motion for judgment as a matter of law de novo.  Abel v. Dubberly, 210 F.3d 1334, 1337 (11th Cir. 2000).

"Rulings on the admission of evidence are reviewed for abuse of discretion." U.S. Steel, LLC, v. Tieco, Inc., 261 F.3d 1275, 1286 (11th Cir. 2001) (citation omitted).[4]  "An abuse of discretion arises when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an

---

[4] Inherent in this standard "is the firm recognition that there are difficult evidentiary rulings that turn on matters uniquely within the purview of the district court, which has first-hand access to documentary evidence and is physically proximate to testifying witnesses and the jury." Tran v. Toyota Motor Corp., 420 F.3d 1310, 1315 (11th Cir. 2005) (quotation and citation omitted).

12

improper application of law to fact." U.S. v. Smith, 459 F.3d 1276, 1295 (11th Cir. 2006) (quotation and citation omitted). Further, we "will not reverse [the district court's evidentiary rulings] unless an erroneous ruling resulted in a substantial prejudicial effect." Wright v. CSX Transp., Inc., 375 F.3d 1252, 1260 (11th Cir. 2004) (quotation and citation omitted).

### III.  ANALYSIS

### A.  Rule 50 Motion: Conversion and Civil Theft Claims

On February 19, 2008 the district court granted Defendants' Rule 50 Motion for Judgment as a Matter of Law against Hawksbay's conversion and civil theft claims. Hawksbay contends that this ruling was fundamentally flawed.

Rule 50 requires a court to render a judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1) (2007). In reviewing a motion for judgment as a matter of law, "we consider all the evidence in the light most favorable to the non-moving party, and independently determine whether the facts and inferences point so overwhelmingly in favor of the movant that reasonable people could not arrive at a contrary verdict." Webb-Edwards v. Orange County Sheriff's Office, 525 F.3d 1013, 1029 (11th Cir. 2008) (citation omitted).

13

**1. Conversion**

Hawksbay contends the district court erred when it entered Judgment as a Matter of Law against its conversion claim.  We agree.

"[C]onversion is an unauthorized act which deprives another of his property permanently or for an indefinite time."  Nat'l Union Fire Ins. Co. of Pa. v. Carib. Aviation, Inc., 759 F.2d 873, 878 (11th Cir. 1985) (quoting Senfeld v. Bank of N.S. Trust Co. (Cayman), 450 So. 2d 1157, 1160-61 (Fla. 3d DCA 1984)).  Conversion must be proven by a preponderance of the evidence.  Small Bus. Admin. v. Echevarria, 864 F. Supp. 1254, 1264 (S.D. Fla. 1994).  Under Florida law, the claimant must further establish "possession or an immediate right to possession of the converted property at the time of conversion."  U.S. v. Bailey, 419 F.3d 1208, 1212 (11th Cir. 2005).  While demand by the rightful owner serves as actual notice of the rights of the bereaved party to the recipient, demand and refusal are not required elements for a conversion claim.  Senfeld, 450 So. 2d at 1161.  "The generally accepted rule is that demand and refusal are unnecessary where the act complained of amounts to a conversion regardless of whether a demand is made."  Goodrich v. Malowney, 157 So. 2d 829, 832 (Fla. 2d DCA 1963) (citation omitted).

A conversion claim for money also requires proof that the funds are specific

-14-

and identifiable. Navid v. Uiterwyk Corp., 130 B.R. 594, 595 (M.D. Fla. 1991) (citing Allen v. Gordon, 429 So. 2d 369 (Fla. 1st DCA 1983). "Money is capable of identification where it is delivered at one time, by one act and in one mass, or where the deposit is special and the identical money is to be kept for the party making the deposit, or where the wrongful possession of such property is obtained." Belford Trucking Co. v. Zagar, 243 So. 2d 646, 648 (Fla. 4th DCA 1970) (citation omitted). This identification requirement ensures that a fund of money *actually exists to pay a specific debt owed* and the claimant is not merely transforming a contract dispute into a conversion claim. Allen, 429 So. 2d at 371; see also Gasparini v. Pordomingo, 972 So. 2d 1053, 1056 (Fla. 3d DCA 2008) (citation omitted) ("For money to be the object of conversion 'there must be an obligation to keep intact or deliver the specific money in question, so that money can be identified.'"); Fla. Desk, Inc. v. Mitchell Int'l, Inc., 817 So. 2d 1059, 1061 (Fla. 5th DCA 2002) ("[T]here is no evidence that there was any obligation on [the defendant's] part to keep intact or hold a specific fund to deliver to [the plaintiff]."); Gambolati v. Sarkisian, 622 So. 2d 47, 49 (Fla. 4th DCA 1993) (funds not identifiable because defendant "was seeking to enforce an obligation to pay money and nothing more . . . . [the defendant] was not required to pay to [the plaintiff] the identical monies he collected"); Rosen v. Marlin, 486 So. 2d 623,

-15-

625 (Fla. 3d DCA 1986) ("This is not a case where a party intentionally received a specifically identifiable sum of money knowing that he had no right to take it and who refused to give it back"); Russell v. The Praetorians, 28 So. 2d 786, 789 (Ala. 1947) (citation omitted) ("It seems to be well settled, that trover lies for the conversion of money, where there is an obligation on the part of the defendant to return specific coin or notes intrusted to him.").

Here, the court held that Hawksbay failed to establish a sufficient evidentiary basis to find Solowsky liable for conversion. The court found that Hawksbay did not establish by a preponderance of the evidence (1) "that the funds in question were specifically and identifiably the funds of Hawksbay"; and (2) "an undisputed right to immediate possession of the property in question." (Trial Tr. at 828-29.) We disagree.

### a. Specific and Identifiable Funds

Hawksbay produced sufficient evidence for a reasonable jury to find that the six million dollars in trust was specific and identifiable. The funds were delivered by Reizen to Solowsky at one time, on October 16, 2003; by one act, a wire transfer; and in one mass, six million dollars. Unlike the plaintiffs in cases such as Gambolati and Florida Desk, Hawksbay's suit was not brought to enforce a general obligation to pay money, but to recover the actual ten million dollars that Reizen

allegedly stole from it. <u>See</u> 622 So.2d at 49; 817 So. 2d at 1061. Here, Reizen was under an obligation to keep intact or hold the ten million dollars Hawksbay gave him to invest. A jury could find the fund was a specifically identifiable sum of money.

Further, Reizen's testimony and the transfer documents specifically identify the money as Hawksbay's. Reizen put "Hawksbay/Brenman" on the bottom of the October 16, 2003 transfer documentation (Jt. Ex. 3) and Reizen testified that he labeled the transaction Hawksbay/Brenman because "[t]he funds belonged to either Hawksbay or one of their related companies through Mr. Brenman" (Trial Tr. at 340). Reizen further testified that he told Solowsky the funds belonged to Hawksbay[5] and that Reizen had control over the funds based on his Management Agreement with Tambourine.[6] In fact, Reizen testified that Solowsky would not

---

[5] Mr. Garnett:    Okay. Now did you tell [Solowsky] that you personally owned these funds before they came into his account?
Mr. Reizen:    No.
Mr. Garnett:    Did you tell [Solowsky] that they belonged to Hawksbay or one of the Plaintiffs?
Mr. Reizen:    Yes.

(Trial Tr. at 344.) Mr. Garnett is Hawksbay's attorney in this case.

[6] Mr. Garnett:    And did you tell [Solowsky] that you believed that whatever control you had over the funds was related to either your being on the board of directors or to this management agreement?
Mr. Reizen:    Yes.

(Trial Tr. at 350.) The Management Agreement was between Reizen and Tambourine, not Hawksbay. Nevertheless, Reizen alleged that this Agreement authorized him to possess

-17-

move the funds into the IOTA account until he saw Reizen's Management Agreement.[7] Further, Reizen's written authorizations to disburse the money held in trust routinely referred to the funds as belonging to Sitindustrie, Brenman, Tambourine, Hawksbay and/or Kobarid. (See, e.g., Jt. Ex. 7; Jt. Ex. 8; Defs.' Ex. 9; Defs.' Ex. 12; Defs.' Ex. 21; Defs.' Ex. 22.) On this basis, a jury could find that the six million in trust was a specific fund of money that rightfully belonged to Hawksbay.

The district court held that the aforementioned evidence was insufficient because Hawksbay did not trace the funds "from the start of a paper trail to its deposit in the Defendant's account." (Trial Tr. at 829.) Defendants also cite to Hawksbay's failure to accurately trace the funds in their Appellate brief. However, to establish that funds are "specific and identifiable," a detailed tracing of the money is not required. As discussed above, funds are "specific and identifiable" if the claimant can prove that the defendant had an obligation to deliver a fund of money and that fund of money actually exists to pay a specific debt owed. See, e.g., Allen, 429 So. 2d at 371; Gasparini, 972 So. 2d at 1056.

Hawksbay's funds.

[7] Mr. Garnett: And when did you give [Solowsky] a copy of the management agreement?

Mr. Reizen: I believe it was in the first discussions we had before the funds – before he agreed to accept the funds to his account.

(Trial Tr. at 351.)

Here, Hawksbay has presented sufficient evidence that Reizen had an obligation to deliver ten million dollars to Hawksbay and that the six million dollars transferred to the IOTA account was part of that ten million. The fact that the ten million dollars were co-mingled with other investments does not make the funds unidentifiable or unspecific.[8] As far as Hawksbay is concerned, Hawksbay gave Reizen ten million dollars to invest and through numerous investment strategies Reizen lost $4.5 million. Reizen still had an obligation to keep intact the remaining $5.5 million and return it to Hawksbay. Hawksbay presented sufficient evidence that Reizen put the remaining money from the Hawskbay ten million into Solowsky's IOTA account. As discussed above, Reizen identified the money in trust as belonging to Hawskbay both in testimony and on all the transfer documentation. Defendants' evidence that the trail of the Hawksbay ten million was lost once the Avenin Note was sold and the proceeds were transferred to Schumacher's client account in Switzerland can be considered by a jury. It is possible that the jury will find there is insufficient evidence to link the funds in Switzerland with the funds transferred to the IOTA account. However, viewing the

---

[8] Defendants presented evidence that the Hawksbay ten million was pooled with other money into a one hundred million dollar investment in Avenin. Defendants contend that once the Hawksbay ten million was co-mingled with the rest of the Avenin one hundred million dollar investment, Reizen's indebtedness to Hawksbay became nothing more then general indebtedness. We find no merit in this argument.

-19-

evidence in the light most favorable to Hawksbay, we find that Hawksbay presented sufficient evidence for a jury to find that the funds held in trust were specifically and identifiably Hawksbay's as part of the ten million given to Reizen to invest.

### b. Undisputed Right to Immediate Possession of the Funds

Hawksbay presented sufficient evidence for a jury to find that Hawksbay had an undisputed right to immediate possession of the money in trust. As discussed above, Reizen identified the funds as belonging to Hawksbay on the transfer documentation and Reizen testified that he told Solowsky the funds did not belong to him, but "belonged to Hawksbay or one of the Plaintiffs." (Trial Tr. at 344.) Defendants, however, did present evidence asserting that Hawksbay did not have an undisputed right to all of the money held in trust. Reizen testified that "there was a family dispute going on between members of the Bocciolone family." as to who the funds belonged to. (Id. at 343.) The transfer authorization slips also refer to the money in trust as belonging to all the various parties connected with Sitindustrie: Sitindustrie, Brenman, Hawksbay, Tambourine, and Kobarid. (See, e.g., Jt. Ex. 7; Jt. Ex. 8; Defs.' Ex. 9; Defs.' Ex. 12; Defs.' Ex. 21; Defs.' Ex. 22.) Further, Reizen testified that he thought Hawksbay owed him around two million

dollars under the Management Agreement.[9]  Nevertheless, whether Hawksbay had an undisputed right to the money in trust is a question that should be left to the jury.  A jury may find that Hawksbay did not have an undisputed right to those two million dollars and modify their award accordingly or that Hawksbay did not have an undisputed right to any of the money in trust.  Viewing the evidence in the light most favorable to Hawksbay, however, the evidence does not point so overwhelmingly in favor of Defendants that reasonable people could not find that Hawksbay had an undisputed right to immediate possession of the entire six million in trust.

### c. An Unauthorized Act Which Deprives Another of His Property[10]

Hawksbay presented sufficient evidence for a reasonable jury to conclude that Solowsky's control over the funds and his disbursal of those funds were

---

[9] Mr. Garnett:  All right.  Now, it's true, isn't it, Mr. Reizen, that you didn't believe that you were entitled to all 6 million; isn't that true?

Mr. Reizen:  That's true. . . .

Mr Garnett:  Okay.  And, in fact, you believed that the right to this – to these funds – the right to be paid these fees pursuant to the management agreement was, at most, maybe a little bit more than 2 million, correct?

Mr. Reizen:  Correct.

(Trial Tr. at 352.)

[10]  The district court did not rule on the sufficiency of Hawksbay's evidence on this issue.  However, as we review a Rule 50 motion de novo, we must consider all aspects of Hawksbay's conversion claim.  See Abel, 210 F.3d at 1337.

unauthorized acts which deprived Hawksbay of its funds. Solowsky communicated with Hawksbay's attorney, Joel Weiss, by phone on October 23, 2003 and October 31, 2003 about Hawksbay's missing funds. On October 31, 2003 Weiss told Solowsky that his "clients want to recover their missing money. So there is no dispute about that." (Pls.' Ex. 7 at 2.) In response, Solowsky told Weiss that he could help Hawksbay recoup over five million of the missing ten million dollars. (Id. at 5.) Yet, after this phone call, instead of returning the $5.5 million in Solowsky's possession, Solowsky disbursed over four million dollars without Hawksbay's approval, leaving only $1,456,775 in trust to return to Hawksbay. These dispersals were made per Reizen's instructions and were solely for Solowsky's and Reizen's benefit,[11] depriving Hawksbay of over four million

---

[11] The dispersals were as follows:

| Date | Amount and Recipient |
|---|---|
| 01/21/2004: | $7,500 to David M. Turner, III |
| 02/12/2004: | $83,750 to Klein, Walker & Associates |
| | $51,560 to Bland Payne Holdings USA, Inc. |
| | $85,000 to The Carolina Trading Company |
| | $100,000 to PSA's operating account |
| 04/07/2004: | $145,920 to Klein, Walker & Associates |
| 05/24/2004: | $550,000 to J.P. Morgan Chase Bank |
| | $275,000 to The Carolina Trading Company |
| 09/20/2004: | $1,400,000 to The Carolina Trading Company |
| | $200,000 to PSA's operating account |
| 11/03/2004: | $1,040,000 to Reizen |
| 09/06/2005: | $20,000 to PSA |
| | $65,000 to Reizen |

(Jt. Ex. 10, Uncontested Facts at 5-6.) Reizen testified that the payment to J.P. Morgan Chase was for his benefit (Trial Tr. at 360) and that Carolina Trading Company; Klein, Walker &

dollars. Further, Solowsky did not transfer the remaining funds to Hawksbay until August 9, 2006. (Jt. Ex. 10, at 8-9.) Thus, a jury could conclude that Solowsky deprived Hawksbay of the entire six million dollars from October 16, 2003 until August 9, 2006.

We therefore reverse the district court's Judgement as a Matter of Law on Hawksbay's conversion claim. Our holding does not suggest that a jury should find Solowsky liable of conversion. We merely hold that Hawksbay provided sufficient evidence for this issue to be resolved by a jury.

## 2. Civil Theft

Hawksbay contends the district court also erred when it entered Judgment as a Matter of Law against Hawksbay's civil theft claim. We agree.

"To establish a claim for civil theft, a party must prove that a conversion has taken place and that the accused party acted with criminal intent." Gasparini, 972 So. 2d at 1056. Florida Statute § 812.014 defines a civil theft:

> (1) A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:

Associates and Bland Payne Holdings USA, Inc. were companies that he (Reizen) used to make payments to himself (id. at 361). David M. Turner, III was hired by Defendants as a consulting expert for the Kobarid litigation. (Jt. Ex. 10, Uncontested Facts at 5.) The payment to Turner was therefore also for Reizen's benefit. (Id.)

-23-

> (a) Deprive the other person of a right to the property or a benefit from the property.
> (b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.

Fla. Stat. § 812.014(1) (2007).

Under Florida law, the elements of civil theft must be proven by clear and convincing evidence. Fla. Stat. § 772.104 (2007). "Clear and convincing evidence is an intermediate standard between the preponderance of the evidence standard and the criminal beyond a reasonable doubt standard." Echevarria, 864 F. Supp. at 1265 (citation omitted). "Clear and convincing evidence does not mean 'unequivocal,' or 'proof that admits of no doubt.'" U.S. v. Owens, 854 F.2d 432, 436 (11th Cir. 1988) (quoting Addington v. Texas, 441 U.S. 418, 432 (1979). "[A] party who has the burden of proof by clear and convincing evidence must persuade the jury that his or her claim is highly probable." Id. at n.8.

Here, the district court held that Hawksbay did not establish a legally sufficient basis to find that Solowsky committed civil theft. In addition to the deficiencies the court found in Hawksbay's conversion claim, the court found that Hawksbay failed to prove by clear and convincing evidence that Solowsky (1) knowingly obtained or used property of Hawksbay; and (2) "acted with felonious intent to deprive Hawksbay of . . . its right to the property or a benefit thereof."

(Trial Tr. at 830.)  We disagree.

### a. Clear and Convincing Evidence Standard

Hawksbay rightly contends that the district court used the wrong standard of review for civil theft.  The district court incorrectly defined clear and convincing evidence as requiring "proof which leaves no reasonable doubt" and as evidence that is "certain . . . unambiguous . . . and . . . unequivocal."  (Id. at 828.)  This standard is too high.  As discussed above, clear and convincing evidence merely requires proof that the claim is highly probable.  See Owens, 854 F.2d at 436.  Certain, unambiguous, and unequivocal evidence is explicitly not required.  Id. at n.8.  Nevertheless, as we review Rule 50 Motions de novo, we do not consider whether the district court's error affected the outcome of the Rule 50 Motion.  See Abel, 210 F.3d at 1337.  Rather, we look at all of the evidence to determine whether a reasonable jury could find Hawksbay's civil theft claim highly probable.

### b. Knowledge Requirement

Hawksbay presented enough evidence for a reasonable jury to find that Solowsky knew the money in trust belonged to Hawksbay.  When Solowsky first obtained the funds from Reizen on October 19, 2003 he could have concluded that Reizen had a legitimate interest in those funds.  Reizen signed an engagement letter warranting that he had full and complete authority over the funds.  (Supra p. 6-7,

Jt. Ex. 6.) Reizen also testified that he thought he had control over the funds because of his Management Agreement and that he communicated this to Solowsky. (Supra p. 17, Trial Tr. at 350.) Further, Reizen testified that Solowsky refused to accept the funds until he saw the Management Agreement. (Supra p. 18, Trial Tr. at 351.) However, Reizen also testified that he told Solowsky the money belonged to Hawksbay (supra p. 17, Trial Tr. at 344) and that he thought he was personally only entitled to a little bit more then two of the six million dollars transferred.[12] A reasonable person could therefore find that Solowsky knew that at least four of the six million dollars belonged to Hawksbay.

Additionally, as soon as Solowsky read the Kobarid complaint,[13] Solowsky

---

[12] 

| Mr. Garnett: | All right. Now, it's true, isn't it, Mr. Reizen, that you didn't believe that you were entitled to all 6 million; isn't that true? |
|---|---|
| Mr. Reizen: | That's true. . . . |
| Mr. Garnett: | Okay. And, in fact, you believed that the right to this – to these funds – the right to be paid these fees pursuant to the management agreement was, at most, maybe a little bit more than 2 million, correct? |
| Mr. Reizen: | Correct. . . . |
| Mr. Garnett: | Okay. Did you – and I've been through various things here. Did you tell [Solowsky] all of the things that you've testified to here this morning about your belief to entitlement of some of the funds, who the owner of the funds were, et cetera? |
| Mr. Reizen: | Yeah, everything came up, pretty much. |
| Mr. Garnett: | Okay. And did he ask you questions to make sure that he understood the situation? |
| Mr. Reizen: | Yeah, we – we went pretty much in depth to understand what was going on. It was a lot of money. |

(Trial Tr. at 350-55.)

[13] This complaint was filed on December 8, 2003.

was put on notice that Hawksbay did not want Reizen in possession of any of its money. Solowsky, the lawyer initially representing Reizen in the Kobarid litigation, surely read and studied the complaint. The Kobarid complaint alleged that "Defendant Reizen . . . conspired in a series of financial transactions to wrongfully transfer over $10,000,000.00 from Plaintiff Hawksbay to accounts controlled by Reizen and others for their personal use." (Kobarid, Dec. 8, 2003 Compl. at 2.) The complaint further alleged that Reizen committed a breach of fiduciary duty, fraud, fraudulent concealment, trespass, conversion, unjust enrichment, and RICO violations. (Id.)

After learning of the Kobarid litigation, Solowsky continued his dominion over the funds. Once Solowsky read the Kobarid complaint he could not have relied on the Management Agreement or anything else Reizen told him to disburse the money held in trust for Reizen's benefit. At this point, Solowsky knew Reizen was probably not entitled to the money he was holding in trust and should not have disbursed any of the funds.[14] Solowsky, however, continued to disburse the money in trust for his and Reizen's benefit. On this basis, a jury could find that Solowsky was liable for civil theft.

We find guidance for this point in Joseph v. Chanin. 940 So. 2d 483 (Fla.

---

[14] Several alternatives were available to Solowsky including depositing the funds with the court or holding it in trust but immediately notifying all the parties of such.

4th DCA 2006). In that case, one of the joint tenants of a bank account wrongfully appropriated more than his share of the money. Id. at 485. When he died that money went to a third party. Id. After the third party was informed she possessed more then her equal share, the third party refused to return the misappropriated money to the rightful owner. Id. The court held that the third party was liable for conversion because she kept the identifiable funds after she knew they did not belong to her and refused a demand to restore the funds to the rightful owner.[15] Id. at 485-87. Like the defendant in Joseph, Solowsky may be held liable for civil theft because he kept the funds after he knew that they did not belong to Reizen.[16]

### c. Felonious Intent Requirement

Evidence that Solowsky lied to Joel Weiss about the location of the funds and disbursed a majority of the funds to or on behalf of Reizen is a sufficient basis for a reasonable jury to find that Solowsky acted with felonious intent to deprive Hawksbay of its funds. Hawksbay presented evidence that Solowsky lied to Weiss about the location of the almost six million dollars in trust that Reizen had labeled

---

[15] While this case addresses conversion, the same principle is applicable to a claim for civil theft. The civil theft statute does not require that a party acquired the stolen property. The statute specifies that it punishes any party that "knowingly obtains or uses, or endeavors to obtain or to use the property of another." Fla. Stat. § 812.014(1). Thus, even if a party innocently obtained stolen property, once a party knows the property belongs to another and still "uses" the property that party may be liable for civil theft.

[16] Even knowing of Reizen's claim to some of the money, Solowsky knew that most of the funds belonged to Hawksbay.

-28-

as Hawksbay/Brenman. During their October 31, 2003 conversation, Weiss asked Solowsky "Do you know where the 5 Million is currently?" and Solowsky responded "I can't say. I do not know at this point." (Pls.' Ex. 7 at 5.) Weiss then asked again "Is it in the possession of your clients do you believe?" (Id.) Solowsky again responded "I do not know. I think that it may be, but I don't know, Joel." (Id.) Solowsky then attempted to induce Hawksbay to stop looking for the money.[17] After this conversation, instead of returning the money in trust to Hawksbay or notifying Weiss that the money was in his account, Solowsky continued to disburse the funds for his and Reizen's benefit.

Defendants argue that Solowsky had a duty to his client, Reizen, to comply with Reizen's instructions. It is true that a lawyer does not have an obligation to "take affirmative steps to discover client fraud or future crimes." U.S. v. Del Carpio-Cotrina, 733 F. Supp. 95, 99 n.9 (S.D. Fla. 1990). In this case, however, affirmative steps were not required for Solowsky to discover that he should not comply with Reizen's instructions. As discussed above, the Kobarid complaint, which Solowsky was required to read as Reizen's lawyer, put him on notice that

---

[17] Solowsky said, "And, in the meantime, because Swiss bankers get to be a little bit skittish, we would want whatever you guys are doing over there to stand still so as not to make it more difficult." (Pls.' Ex. 7 at 8.) Defendants assert in their Appellate Brief that Solowsky sought a stand still because he did not believe the $5.5 million in the IOTA account would be sufficient to settle the case.

Reizen was no longer entrusted to manage Hawksbay's money. Hawksbay presented evidence that even after reading the Kobarid complaint, Solowsky did not stop disbursing the money in trust for his and Reizen's benefit or tell Hawksbay (Weiss) that he (Solowsky) was in possession of six million dollars transferred to him by Reizen. Hawksbay presented evidence that Solowsky kept the location of the funds secret for over two years. Fausto Bocciolone, a director of Hawskbay and the CEO of Hawksbay's parent company, testified that he did not learn the money was in Solowsky's account until December 2005; after Solowsky had transferred over four million dollars out of the trust accounts for Reizen or Solowsky's benefit. (Trial Tr. at 62.)

Solowsky's secrecy about the location of the funds and his continual disbursements of money to himself and Reizen without Hawksbay's consent support the felonious intent requirement of a civil theft claim.

### d. Deprivation of Entitled Party's Right to Property and Appropriation of Property for Benefit of Unentitled Party[18]

On October 31, 2003 Weiss informed Solowsky that Hawksbay wanted to recover its lost money. (Pls.' Ex. 7 at 2.) The Kobarid Complaint, filed on December 8, 2003, clearly informed Solowsky that Hawksbay thought Reizen stole

---

[18] The district court did not rule on the sufficiency of Hawksbay's evidence on this issue. However, as we review a Rule 50 motion de novo, we must consider all aspects of Hawksbay's civil theft claim. (See p. 21, n.10.)

the funds and that Hawksbay wanted the money back.  It certainly informed Solowsky that Hawksbay did not want the money in trust transferred for Reizen's benefit.  Yet after December 8, 2003, without Hawksbay's consent, Solowsky transferred over four million dollars from the funds in trust for Reizen's, not Hawksbay's, benefit.  Only $1,456,775 was left in the trust accounts to return to Hawksbay.  These actions support an inference that Solowsky deprived Hawksbay of its money and appropriated the property for Solowsky and Reizen's use; two parties not entitled to the funds.

We therefore reverse the district court's Judgment as a Matter of Law on Hawksbay's civil theft claim.  Our holding does not suggest that a jury must find Solowsky liable of civil theft.  We merely hold that Hawksbay provided enough proof at trial for this issue to be resolved by a jury.

**B.  Rule 50 Motion: Breach of Fiduciary Duty Claim**

Tambourine has appealed the district court's grant of Defendants' Rule 50 Motion on its breach of fiduciary duty claim, arguing that the court applied the wrong statute of limitations. We affirm the district court on this point.  Before laying out our analysis, we first explain the grounds for and procedural history of Tambourine's claim.

**1.  Background and Procedural History of Tambourine's Breach of Fiduciary Duty Claim**

Tambourine's breach of fiduciary duty claim was originally based on two alleged breaches. The first was based on Defendants' alleged mishandling of the six million dollars held in trust. The second was based on Defendants' duty of loyalty to Tambourine as a former client[19] - specifically, Tambourine claimed that Defendants breached their duty of loyalty by representing Reizen in litigation adverse to Tambourine.[20]

When the district court ruled on Defendants' Motion for Summary Judgment, it limited Tambourine's claim so that it was only based on the latter breach - that is, Tambourine's claim was limited to one based solely on Defendants' duty of loyalty to Tambourine as its former client. (See D.E. #154 at 22 n.5.)[21] The court found genuine issues of material fact existed as to Defendants' breach of their duty of loyalty through their subsequent representation of Reizen in

---

[19] As explained above, Tambourine briefly retained Defendants in 1999 to locate the missing Lionheart ten million.

[20] According to Rule 4-1.9(a) of the Florida Bar Rules of Professional Conduct, "[a] lawyer who has formerly represented a client in a matter" shall not later "represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent."

[21] The court also disposed of Tambourine's claim insofar as it was based on Defendants' mishandling of the money in trust. This was because it ruled that Tambourine did not have any interest in the Hawksbay ten million, as Tambourine was merely Hawksbay's creditor. (See D.Es. #75, 85.)

-32-

the Kobarid case and the related 2003 settlement negotiations with Joel Weiss,[22] and in their representation of Reizen in the 2000 Power Trading case.[23]

At the close of Plaintiffs' case at trial, the court granted Defendants' Rule 50 Motion on Tambourine's breach of fiduciary duty claim. The court found Tambourine's claim was barred by the two-year statute of limitations applicable to professional malpractice claims. See Fla. Stat. § 95.11(4)(a). Tambourine now appeals, arguing that the court should have applied the four-year statute of limitations applicable to intentional torts found at section 95.11(3)(o). Defendants, in turn, argue that the court was correct in treating Tambourine's breach of fiduciary duty claim as an action for professional malpractice subject to the two-year statute of limitations. They also argue that the court was correct in disposing of Tambourine's claim as untimely. We agree with both of Defendants' arguments for the reasons articulated below.

## 2. Applicable Statute of Limitations

Tambourine argues that the district court should have applied the four-year

_____

[22] The court found evidence supporting the argument that Defendants' 2003 settlement negotiations with Joel Weiss were related to the recovery of the Lionheart ten million (the sum of money Tambourine hired Defendants to find in 1999).

[23] The Power Trading case was a suit filed by investors against Reizen and others in 2000. PSA and Solowsky represented the defendants in that case, which settled later that year. The court found record evidence to suggest that Power Trading involved funds that were co-mingled with the Lionheart ten million.

statute of limitations applicable to intentional torts, rather than the two-year statute of limitations applicable to professional malpractice claims. We do not agree.

Section 95.11(3)(o) states that a four-year statute of limitations shall apply to "[a]n action for assault, battery, false arrest, malicious prosecution, malicious interference, false imprisonment, or any other intentional tort, *except as provided in subsections (4), (5), and (7)*." (Emphasis added). By its plain text, section 95.11(3)(o) carves out exceptions for the actions listed in subsections (4), (5), and (7) - and subsection (4)(a) contains the two-year statute of limitations for professional malpractice claims. Thus, it appears that the statute explicitly *excepts* professional malpractice claims from the four-year statute of limitations applicable to other intentional torts.

Tambourine argues that a breach of fiduciary duty claim based on the attorney-client relationship can give rise to a claim for professional malpractice subject to the two-year statute of limitations, *as well as* an intentional tort subject to the four-year statute of limitations. However, Florida case law indicates that a claim styled as one for "breach of fiduciary duty" claim, when brought against a law firm or attorney for actions relating to the attorney-client relationship, is treated as a malpractice claim subject to the two-year statute of limitations. One example is <u>Mizrahi v. Valdes-Fauli, Cobb & Petrey, P.A.</u>, 671 So. 2d 805 (Fla. 3d

-34-

DCA 1996). There, the plaintiffs brought fraud and breach of fiduciary duty claims against attorneys who acted both as attorneys and escrow agents for the corporation from which the plaintiffs purchased land. Id. The trial court granted summary judgment to the defendants because it found the claims barred by the two-year professional malpractice statute of limitations in section 95.11(4)(a). Id. The Third District reversed, finding that the vocation of escrow agent did not qualify as a profession, and stated that "[r]egardless of the benefits defendants derived from their knowledge of the law in the fulfillment of their duties as escrow agent, *they were not acting as plaintiff' attorneys*. Therefore, the four-year statute of limitations, rather than the two-year professional malpractice limit, applies to this action." Id. at 806 (emphasis added).

In another case, the plaintiff brought an action for fraud and breach of fiduciary duty against the defendant, and the question on appeal was whether the two-year malpractice statute of limitations applied to those claims. Beach Higher Power Corp. v. Rekant, 832 So. 2d 831 (Fla. 3d DCA 2002). The court held that the defendant "could not be considered [the plaintiff's] attorney for the purposes of the instant suit, and accordingly, the two year limitations period did not control." Id. at 833-34.

In Green v. Bartel, the plaintiff filed claims for negligence, breach of

-35-

contract, and breach of fiduciary duty against her attorneys for their wrongful acts in disbursing her funds without permission. 365 So. 2d 785 (Fla. 3d DCA 1978). The court applied the two-year malpractice statute of limitations to the plaintiff's claims, without considering the fact that the plaintiff did not technically style her claims as malpractice claims. Id. at 787-88.

Further, in Palafrugell Holdings, Inc. v. Cassel, the court made the following observation in a footnote:

> A claim for breach of fiduciary duty, coupled with a claim for legal malpractice, does not necessarily combine to form one claim for legal malpractice. Rather, a complaint containing each of these claims can be one in which the plaintiff is pleading *in the alternative*, a perfectly acceptable practice under Florida law. Fla. R. Civ. P. 1.110(g). If the plaintiff is unable to establish that there existed an attorney-client relationship, there is the possibility that some other form of fiduciary relationship existed, for example, that of escrow agent.

825 So. 2d 937, 940 n.2 (Fla. 3d DCA 2001) (citations omitted) (emphasis added). This footnote, along with the preceding caselaw, all indicate that if a breach of fiduciary duty claim does involve an attorney-client relationship, it is considered a malpractice action. See also Wilder v. Meyer, 779 F. Supp. 164, 169 (S.D. Fla. 1991) (where the plaintiff brought an action for, among other claims, breach of fiduciary duty against his attorney, the court stated without comment that the claim was "governed by a two-year statute of limitations applicable to professional

-36-

malpractice claims," citing to Fla. Stat. § 95.11(4)(a)).

Based on the plain text of sections 95.11(3)(o) and 95.11(4)(a) and also the guidance provided by Florida courts, we hold the district court was correct in treating Tambourine's breach of fiduciary duty claim against its former counsel as a professional malpractice claim subject to the two-year statute of limitations.

### 3. Disposal of Tambourine's Claim

We also hold that the district court was correct in granting Defendants' Rule 50 Motion on Tambourine's breach of fiduciary duty claim. Before explaining our conclusion, we first explain the basis for Tambourine's appeal. The district court disposed of Tambourine's claim on two separate grounds. The first was the applicable two-year statute of limitations, discussed above. The second was a substantive ruling wherein the court found Defendants' representation of Reizen in Kobarid was not substantially related or materially adverse to Tambourine, and so could not form the basis of a breach of fiduciary duty claim. As Defendants point out, Tambourine did not appeal this substantive ruling. It is a well-established rule in this Circuit that "[i]ssues not clearly raised in the briefs are considered abandoned." Marek v. Singletary, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) (citation omitted). Thus, it is irrelevant whether the court properly disposed of Tambourine's breach of fiduciary duty claim insofar as that claim is based on

Defendants' representation of Reizen in <u>Kobarid</u>, because Tambourine did not appeal the court's substantive ruling disposing of it.

That said, there are two remaining bases for Tambourine's breach of fiduciary duty claim: Defendants' representation of Reizen in the 2000 <u>Power Trading</u> case, and Defendants' settlement negotiations with Joel Weiss in October 2003.  However, we have already ruled that the two-year statute of limitations applies to Tambourine's claim.  Thus, whether Tambourine's claim is based on Defendants' representation of Reizen in the 2000 <u>Power Trading</u> case or on the 2003 settlement negotiations, Tambourine missed the two-year deadline by waiting until 2006 to file its claim.

In sum, we affirm the court's grant of Defendants' Rule 50 Motion on Tambourine's breach of fiduciary duty claim.  That claim was untimely, as it was not filed within the two-year statute of limitations applicable to professional malpractice actions.

## C.  Turner Evidence[24]

Hawksbay appeals the district court's exclusion of documentary and

---

[24]  The remaining issues deal with the district court's exclusion of some of Hawksbay's evidence.  These issues are essentially moot because the jury never got to consider Hawksbay's case.  However, because we are reversing the court's grant of Defendants' Rule 50 Motion insofar as it disposed of Hawksbay's conversion and civil theft claims and sending those claims back to be retried, we will address and provide guidance on these evidentiary questions.

testimonial evidence from witness David Turner ("the Turner evidence").  We ultimately reverse the district court, dealing with Turner's documents and trial testimony separately.  Before beginning our analysis, we first explain Turner's identity and the procedural history behind these two questions.

### 1.  Background and Procedural History of the Turner Evidence

David Turner was a certified public accountant hired to provide forensic accounting services on Reizen's behalf in the Kobarid lawsuit.  Solowsky himself hired Turner as a consultant in 2004, before Solowsky and his firm were disqualified from defending Reizen in that case.[25]  Although Turner was vague about the reason for his being hired,[26] Reizen testified that Turner was hired to determine the amount of money Reizen was owed under the Management Agreement with Hawksbay.  (Trial Tr. at 362.)  Turner did not testify in Kobarid.

Hawksbay subpoenaed Turner for trial on September 17, 2007, and again in December of 2007 after the case was transferred to Judge Gonzales and rescheduled for trial.  On January 30, 2008 Defendants moved to quash Turner's

---

[25]  As explained above in Footnote 11, Defendants paid Turner for his services in the Kobarid case out of the money Reizen gave them to hold in trust.

[26]  When asked what he was hired to do in the Kobarid case, he stated he was "asked to prepare a schedule that would be used as a settlement in a lawsuit with Mr. Reizen that Mr. Solowsky was helping Mr. Reizen with. . . .  I was doing a damage calculation and trying to put together a schedule that could be used in those settlement negotiations. . . .  I started off with a ten million dollars amount and worked through a series of deductions that was told related to that 10 million."  (Trial Transcript at 442-43.)

trial subpoena and also to exclude the Turner evidence. (See D.E. #186.) One of Defendants' arguments was that the evidence was protected work product. On February 8, 2008 the court denied those Motions, ruling that the Turner evidence was "relevant and material" and that the work product privilege did not apply.

During Reizen's direct examination at trial Hawksbay began inquiring into Reizen's relationship with Turner, and attempted to introduce documents from Turner's files related to his accounting work on Reizen's behalf. At this point Defendants objected on the basis of the work product doctrine and renewed their Motion to exclude the Turner evidence. (Trial Tr. at 372.) This time the court granted the Motion, finding that "the crime fraud exception does not apply here" but that "the work product exception does apply here." (Id. at 378.) Hawksbay called Turner to provide an offer of proof, after which the court excluded his testimony and documents on the basis of the work product doctrine. (Id. at 446.)

### 2. Turner's Documents[27]

---

[27] It is important to note at the outset that the only Turner documents at issue are those Hawksbay proffered at trial. According to Federal Rule of Evidence 103(a)(2), "[e]rror may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected," and "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked," although nothing in Rule 103(d) "precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court." Here, Hawksbay only proffered four documents. (See Trial Tr. at 441.) These documents were referred to as P31-01, P31-02, P31-04, and P31-05, which is how we refer to them here.

In its initial brief Hawksbay claims that Rule 26(b)(4)(B)[28] governs whether

the Turner evidence should have been excluded, not the work product rule at Rule

26(b)(3). Essentially, Hawksbay is arguing that where Rule 26(b)(4)(B) applies, it

overrides the work product rule at Rule 26(b)(3).[29] However, as Defendants point

out, Hawksbay never made this argument to the district court. "As a general rule,

we do not consider arguments raised for the first time on appeal." Walton v.

Johnson & Johnson Servs., Inc., 347 F.3d 1272, 1292 (11th Cir. 2003) (citation

omitted). Accordingly, we will not address whether Rule 26(b)(4)(B) governing

non-testifying expert witnesses overrides Rule 26(b)(3) governing work product.

Instead, we will address the question posed to the district court - that is, the

admissibility of Turner's documents under Rule 26(b)(3).

The federal work product doctrine is codified in Federal Rule of Civil

Procedure 26(b)(3). The rule states, in pertinent part:

> (A)  Ordinarily, a party may not discover documents
> and tangible things that are prepared in
> anticipation of litigation or for trial by or for

---

[28] According to Rule 26(b)(4)(B) a party ordinarily may not discover facts known or opinions held by a non-testifying expert retained by another party in anticipation of litigation or to prepare for trial. However, a party may do so "on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means." Rule 26(b)(4)(B)(ii).

[29] Specifically, Hawksbay argues that "the work product doctrine does not govern expert information. Rather, the disclosure of expert information is governed by [Rule] 26(b)(4)." (Initial Br. at 43.)

another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:

(I)   they are otherwise discoverable under Rule 26(b)(1); and

(ii)  the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

(B)   Protection Against Disclosure. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

In analyzing the exclusion of Turner's documents under Rule 26(b)(3), we must determine whether that Rule applies to this particular situation. Rule 26(b)(3) explicitly covers documents or things "prepared in anticipation of litigation or for trial *by or for another party or its representative*." (Emphasis added).

We hold that the work product doctrine does not apply to the Turner documents. By its plain text, Rule 26(b)(3) applies to documents or things prepared by or for another party or its representative. Turner prepared the documents at issue here in anticipation of the Kobarid litigation for Reizen. Reizen is not a party to this case. Defendants were not parties to the Kobarid case, but rather served as Reizen's defense counsel for a time. Thus, the Rule's protection

-42-

applies to Reizen, not to Defendants.  Indeed, the Supreme Court itself has stated, albeit in dicta, that "the literal language of [Rule 26(b)(3)] protects materials prepared for any litigation or trial *as long as they were prepared by or for a party to the subsequent litigation*."  FTC v. Grolier Inc., 462 U.S. 19, 25 (1983) (citing 8 J. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2024, at 201 (1970)) (emphasis added).[30]  According to the Wright & Miller article, "[d]ocuments prepared for one who is not a party to the present suit are wholly unprotected by Rule 26(b)(3) even though the person may be a party to a closely related lawsuit in which he will be disadvantaged if he must disclose in the present suit."  We also note that the Ninth Circuit has cited Grolier in "conclud[ing] that [Rule 26(b)(3)], on its face, limits its protection to one who is a party (or a party's representative) to the litigation in which discovery is sought."  In re Cal. Pub. Utils. Comm'n,  892 F.2d 778, 781 (9th Cir. 1989); accord Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., No. 93-3084, 1994 WL 58999, at *4 (6th Cir. 1994) (unpublished).

We acknowledge that this result is somewhat unsettling.  While the Turner documents were prepared on Reizen's behalf in the Kobarid litigation, Solowsky

---

[30]  "We have previously recognized that 'dicta from the Supreme Court is not something to be lightly cast aside.'"  Schwab v. Crosby, 451 F.3d 1308, 1325 (11th Cir. 2006) (quoting Peterson v. BMI Refractories, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997)) (citations omitted).

was Reizen's attorney at that time.  Solowsky actually hired Turner and commissioned the documents at issue here - which are now being sought to prove Hawksbay's claims against Solowsky himself.  Nevertheless, we must abide by the plain text and meaning of the Rule.

Having determined that the work product doctrine does not apply to Turner's documents, we must analyze whether the district court abused its discretion in excluding them.  In general, based on Hawksbay's arguments in response to Defendants' Motion to Quash and its arguments at the pretrial conference, during trial, and in its appellate briefs, this is the crux of what Hawksbay wanted the Turner evidence to establish: that Turner told Solowsky the funds held in trust rightfully belonged to Hawksbay, and that Reizen was only entitled to a small portion of it, if any.[31]  Indeed, in Hawksbay's opposition to Defendants' Motion to Quash, it stated that "in early 2004, Turner learned the underlying fact that the [six million dollars] transferred into the Solowsky Defendants' trust accounts in October 2003 originated from Hawksbay, and Turner then informed the Solowsky Defendants of the Hawksbay origins of this money." (D.E. #190 at 9.)  If true, such

---

[31]  (See, e.g., Pretrial Conf. Tr. at 20) (Hawksbay's attorney: "The information that was gathered by Mr. Turner from Mr. Reisen [sic], which appears to be fully consistent with what Mr. Reisen's [sic] testimony is, plus, whatever it is Mr. Turner told Mr. Solowsky, is very important for us to be able to establish Mr. Solowsky's mindset with regard to this money, going forward."); (Trial Tr. at 378) (Hawksbay's attorney: "The . . . Defendants continue at each stage to try to break apart the pieces into pieces what happened in this case. . . . And we have to – to be able to establish what Mr. Solowsky was aware of, . . . of what it was that he was told.").

evidence would bolster the knowledge and intent prongs of Hawksbay's civil theft claim, and would also support Reizen's testimony that he told Defendants the six million dollars in trust was not his (which would weaken Defendants' charge that Reizen recently fabricated that testimony).[32]

Regarding Turner's documents specifically, Hawksbay claims that Turner's documents "directly trace the Hawksbay funds from the 'Initial Deposit from Hawksbay LTD' to the 'Actual balances on Solowsky's accounts'" and that "[t]hey are the smoking gun that flatly contradicts Solowsky's professed ignorance that the funds belonged to Hawksbay." (Initial Br. at 53.) The Turner documents generally concern the history of the Hawksbay ten million - deposits to and debits from the original sum. It appears that P31-01 is a memorandum from Turner to Reizen asking for information Turner needed to trace the Hawksbay ten million. P31-02 is a spreadsheet put together by Turner that lists a ten million dollar "[i]nitial deposit from Hawksbay" and traces various withdrawals and deposits until it concludes by listing around five million dollars as the "[a]ctual balances on Solowsky accounts." P31-04 appears to be another version of the same spreadsheet as P31-02. P31-05 is

_____

[32] (See, e.g., Hawksbay Resp. to Mot. to Quash, D.E. #190 at 14) ("The Turner evidence provides substantial support to Plaintiffs' allegations of the Solowsky Defendants' wrongful mental state in early 2004 and the key elements of Hawksbay's civil theft claim and Plaintiffs' punitive damages claim, namely the Solowsky Defendants' *knowledge* that the money in their trust account originated from Hawksbay, and criminal *intent* to deprive Hawksbay of that money by disbursing it to themselves and others while concealing its location." (Emphasis in original).

a letter from Reizen to Turner providing information to Turner regarding the history of the Hawksbay ten million, and appears to be a response to P31-01.

These documents certainly appear relevant to Hawksbay's claims against Defendants, and specifically to Hawksbay's argument that Solowsky knew the funds held in trust were connected to Hawksbay. We have already held that the documents are not protected by Rule 26(b)(3), and we see no other reason for their exclusion. Thus, we hold that the court abused its discretion in preventing Hawksbay from introducing them at trial.

### 3. Turner's Testimony

The district court and the parties consistently refer to the "work product doctrine" when analyzing the Turner evidence, both testimonial and documentary. Invoking the work product rule makes sense when referring to Turner's Reizen file because Rule 26(b)(3) explicitly applies to "documents and tangible things," but based on the rule's plain text it does not apply to Turner's testimony. Instead, it would appear that question is governed by Rule 26(b)(4)(B), which covers facts known to or opinions held by non-testifying expert witnesses.

Rule 26(b)(4)(B) states that a party cannot "discover facts known or opinions held by an expert *who has been retained or specifically employed by another party* in anticipation of litigation or to prepare for trial and who is not

expected to be called as a witness at trial."[33]  (Emphasis added).  As Hawksbay

points out, Turner was a non-testifying expert retained by a party to the Kobarid

case (Reizen), not by a party to this case.  Thus, we apply the same logic here as

above with respect to the work product doctrine: Rule 26(b)(4)(B) does not apply

to Turner because he was retained by a party to a different litigation, not by a party

to this case.

Having determined that Rule 26(b)(4)(B) does not apply to Turner's

testimony, we must analyze whether the district court abused its discretion in

excluding such testimony at trial.  Hawksbay claims it wanted to ask Turner what

he knew about the origin of the funds held in trust, and what facts he had regarding

the amount of money that Reizen thought was owed to him.  It appears from

Turner's proffer at trial that he would not have given such testimony.  When asked

whether Solowsky knew that the funds in trust were at all connected to Hawksbay

or Tambourine, Turner said no.  (Trial Tr. at 439.)  Turner testified that Reizen did

not tell him (Turner) that the funds in the trust account had initially come from a

deposit from Hawksbay.  (Id. at 438.)  However, Turner's documents linking the

original Hawksbay ten million to the contents of Defendants' trust account appear

---

[33]  However, a party may do so "on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means."  Rule 26(b)(4)(B)(ii).

-47-

to belie this testimony at least in part. Hawksbay should have been able to question Turner about those documents and about his investigation in general.

In sum, because we find Rule 26(b)(4)(B) inapplicable to Turner's testimony, and we see no other reason to exclude such testimony, we hold that the court abused its discretion in excluding it.

## E.  The Kobarid Outcome

Hawksbay argues that the district court erred in excluding any mention of the verdict and judgment in the Kobarid case. For the reasons articulated below, we affirm the district court on this point. Before analyzing Hawksbay's arguments, we first recount the procedural history of this issue.

### 1.  Background and Procedural History of the Parties' Attempts to Introduce the Kobarid Outcome

It appears that both parties initially sought to bring the Kobarid outcome into the case. On June 20, 2006 Hawksbay asked the court to take judicial notice of the final judgment in Kobarid pursuant to Federal Rule of Evidence 201. (See D.E. #25.) This Motion was never ruled upon. For Defendants' part, in their Motion to Dismiss the Amended Complaint they argued that Tambourine's various claims should be dismissed based on Kobarid, because Tambourine did not obtain a favorable verdict in that case. (See D.E. #66.) Defendants also invoked Kobarid in their answer to the Amended Complaint. (See D.E. #88.) On September 21, 2007

-48-

the parties submitted a joint pretrial stipulation. (See D.E. #130.) Defendants listed the Kobarid verdict and final judgment in their exhibit list, as well as other Kobarid documents. (See id.) The parties' uncontested facts referenced "the verdict and judgment against Reizen in the Kobarid Litigation." (See id.)

On February 2, 2008, six days before trial, Defendants filed a motion in limine seeking to exclude the verdict and judgment. (See D.E. #191.) At a hearing on that Motion Defendants argued that the verdict and judgment should be excluded under Federal Rule of Evidence 403 because they were highly prejudicial and because the jury would be confused and give them undue weight. Defendants argued that Hawksbay would not be prejudiced by their exclusion because Hawksbay never listed the verdict and judgment as exhibits, and also because every witness and exhibit presented in Kobarid had been listed in the instant case. Hawksbay argued that Defendants waived their right to exclude the verdict and judgment, and also that Kobarid was so intertwined with the instant case that Hawksbay had to reference the verdict and judgment to fully explain its claims to the jury. The court granted Defendants' Motion without comment on February 8, 2008, (see D.E. #198), and trial began on February 11, 2008.[34]

_____

[34] We note that while the district court did not elaborate on its reasons for granting Defendants' Motion, we "may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below." Powers v. U.S., 996 F.2d 1121, 1123-24 (11th Cir. 1993).

-49-

## 2. Federal Rule of Evidence 403[35]

According to Rule 403, relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  However, "'Rule 403 is an extraordinary remedy which the district court should invoke sparingly,' and '[t]he balance . . . should be struck in favor of admissibility.'"  U.S. v. Tinoco, 304 F.3d 1088, 1120 (11th Cir. 2002) (quoting U.S. v. Elkins, 885 F.2d 775, 784 (11th Cir. 1989)).  "In reviewing issues under Rule 403, we 'look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact.'"  Id. (quoting Elkins, 885 F.2d at 784).

We hold that the district court did not abuse its discretion in excluding the Kobarid verdict and judgment, based on Rule 403.  In Kobarid Hawksbay sued Reizen over his alleged mishandling of the Hawksbay ten million.  Hawksbay ultimately obtained a jury verdict and final judgment in its favor: the jury found that Reizen stole ten million dollars from Hawksbay.  We can see the danger of the jury here learning of the Kobarid outcome and inappropriately assuming that since

---

[35]  In its briefs Hawksbay does not substantively deal with Rule 403.  However, it was one of Defendants' major arguments in their Motion and at the Motion hearing, and the Court deems it worthy of analyzing first.

Solowsky received six million dollars from Reizen, that sum was part of the stolen Hawksbay ten million and that Solowsky too must have stolen it from Hawksbay.

Further, the district court's order only precluded Hawksbay from mentioning the Kobarid verdict and judgment - it did not prevent Hawksbay from introducing any *evidence* from that case. Indeed, in its appellate briefs Hawksbay does not point to any instance where the court barred them from mentioning or submitting anything related to Kobarid except for the verdict and judgment. Finally, we find it relevant that Kobarid was under appeal at the time Defendants sought to exclude it from trial. It may have seriously complicated the trial if Hawksbay revealed the outcome in Kobarid, but that outcome was subsequently overturned on appeal.

We recognize that the exclusion came at an unfortunate time for Hawksbay: on the eve of trial, and after months of Defendants maintaining that they themselves would use the Kobarid verdict and judgment at trial. However, we are dealing with a high standard: abuse of discretion. Given this high standard, we do not see reversible error in the court's decision to find the Kobarid verdict and judgment so prejudicial or potentially confusing as to warrant their exclusion. Accordingly, we find that the district court did not abuse its discretion in excluding the Kobarid verdict and final judgment.

### 3. Waiver

-51-

Hawksbay also claims that Defendants waived any objection to the admission of the Kobarid verdict and judgment by referencing them in the Joint Pretrial Stipulation. Defendants did list the verdict and final judgment as trial exhibits, and the parties also mentioned "the verdict and judgment against Reizen in the Kobarid litigation" in the uncontested facts. (D.E. #130 at 14.) However, because we have already held it was within the district court's sound discretion to exclude the verdict and judgment based on Rule 403, we need not address whether Defendants waived their right to object. The district court had a right to exclude the evidence on its own, as "[i]t is not only the trial judge's right but his duty to see that only proper and relevant evidence was admitted." Weaver v. U.S., 374 F.2d 878, 882 (5th Cir. 1967).[36]

### 4. Judicial Notice

Hawksbay further argues that the Kobarid verdict and judgment should have been judicially noticed by the district court. Federal Rule of Evidence 201 governs judicial notice of adjudicative facts, and Rule 201(b) states that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot

---

[36] Under Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we are bound by cases decided by the former Fifth Circuit before October 1, 1981.

reasonably be questioned." Rule 201(d) states that "[a] court shall take judicial notice if requested by a party and supplied with the necessary information."

On June 20, 2006 Hawksbay asked the district court to take judicial notice of the final judgment in Kobarid pursuant to Rule 201. (See D.E. #25.) This Motion was never ruled upon. We have stated that "a court may take notice of another court's order only for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation." U.S. v. Jones, 29 F.3d 1549, 1553 (11th Cir. 1994) (citations omitted). However, merely because a fact may be subject to judicial notice, it is not insulated from other rules of evidence such as Rule 403. We have already held it was within the district court's sound discretion to exclude the verdict and judgment based on Rule 403, and Hawksbay's "judicial notice" argument does not change that result.

**5. "Opening the Door**"

Hawksbay also claims that it should have been allowed to reference the Kobarid outcome in rebuttal when Defendants "opened the door" to that topic. This Circuit does recognize the concept of "curative admissibility," also called "opening the door." See, e.g., Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc., 389 F.3d 1339, 1349 (11th Cir. 2004). "Under that doctrine, when a party offers inadmissible evidence before a jury, the court may in its discretion allow the

-53-

opposing party to offer otherwise inadmissible evidence on the same matter to rebut any unfair prejudice created." Id. (citations omitted). Thus, "the extent to which otherwise inadmissible evidence is permitted must correspond to the unfair prejudice created. Further, the trial court must also weigh the need for and value of the rebuttal evidence against the potential for undue delay, confusion, and prejudice." Id. (citations omitted).

Based on Hawksbay's references to the trial transcript in its appellate brief, we believe that this is the basis for its "opening the door" argument: during cross examination the defense asked Reizen, "Did you steal the money in the trust account?" and Reizen replied, "Absolutely not." (Trial Tr. at 400.) Defense counsel also made similar comments in his opening argument - he told the jury they would hear testimony from Reizen that he owned the money in the trust account and had authority to give it to Defendants. On Reizen's redirect Hawksbay's counsel tried to ask about the outcome of Kobarid, arguing that the door had been opened, but the court would not allow it. (Id. at 530.)

We hold that the district court did not abuse its discretion in preventing Hawksbay from asking about the Kobarid outcome in this instance. As stated earlier, the Kobarid judgment had not been finalized and the fact that one jury had found Reizen liable would not bind this jury in any way insofar as Reizen's

credibility. Reizen did not contest the fact that the court had ruled against him in Kobarid, he simply continued to deny that he had done anything wrong.

## F. Remaining Evidentiary Issues

Hawksbay makes several other arguments regarding the district court's exclusion of evidence. We review these arguments below, mindful that "[b]ecause a trial court has broad discretion to determine the admissibility of evidence, we do not disturb evidentiary rulings absent a clear abuse of discretion." U.S. v. Ellisor, 522 F.3d 1255, 1266 n.12 (11th Cir. 2008) (citation omitted).

### 1. Peterson's Testimony

Hawksbay claims that the district court erred in excluding the testimony of Connie Peterson, Hawksbay's former counsel during the Kobarid litigation. (Trial Tr. at 247.) According to Hawksbay, Peterson would have testified that Hawksbay first learned Reizen hid its money in Solowsky's trust account in December 2005. She would have also testified that Solowsky "went ballistic" when she asked him about his conversation with Joel Weiss in 2003 during his Kobarid deposition. (Id. at 245.) Hawksbay claims this testimony would have shown that Solowsky kept the six million dollars secret for two years during the Kobarid litigation, which in turn suggests he had a felonious state of mind.

There are two issues here. First is Peterson's proposed testimony that she

did not learn of the six million dollars in Defendants' trust account until December 2005. We hold that the district court did not abuse its discretion in excluding such testimony, because it clearly would have been cumulative. "District courts are well within their discretion to exclude even relevant evidence for undue delay, waste of time, or needless presentation of cumulative evidence." U.S. v. Dohan, 508 F.3d 989, 993 (11th Cir. 2007) (citing Fed. R. Evid. 403). Indeed, "[d]istrict courts have broad authority over the management of trials. Part of this authority is the power to exclude cumulative testimony." Tran, 420 F.3d at 1315 (citations omitted). Here, Fausto himself had already testified he became aware that six million dollars had been transferred into Defendants' trust account in December 2005. (Trial Tr. at 61-62.) Peterson's testimony would have been cumulative and from a less direct source than Fausto, who was Peterson's client (Peterson was a "second chair" attorney for the plaintiffs in Kobarid).

The second issue is Peterson's proposed testimony regarding Solowsky's angry reaction to being asked about his conversation with Joel Weiss in 2003, when Peterson took Solowsky's deposition in Kobarid. During her proffer Peterson testified that Solowsky and his attorney were "hysterical" when she brought up Solowsky's 2003 conversation with Joel Weiss and the location of Hawksbay's missing money. Peterson stated: "I have never been in a deposition

where counsel or a witness got so angry, red in the face, screaming." (Id. at 229.) Apparently Solowsky did not answer Peterson's questions on this topic and threatened Peterson with sanctions. (Id. at 226, 229.) Hawksbay's attorney argued to the district court that "[h]ow [Solowsky and his attorney] reacted to that was absolutely evidence that they knew they were hiding something that they weren't supposed to be." (Id. at 239.)

We hold that the district court abused its discretion in excluding this evidence. The district court seemed to consider Peterson's testimony on this point irrelevant. However, in our view, testimony about Solowsky's extreme and angry reaction to Peterson's questioning and his refusal to answer are clearly relevant to Solowsky's state of mind - to whether he had a felonious intent with regard to the six million dollars held in trust. We see no other reason to exclude such testimony, and thus we reverse the district court on this point.

### 2. Solowsky Reputation Evidence

Hawksbay also argues that the district court erred in excluding evidence pertaining to Solowsky's reputation. This is the background of Hawksbay's argument: before trial the parties agreed not to discuss certain evidence of claims or complaints against Defendants, which stemmed from other cases. (See D.E. #127.) During defense counsel's opening statement he stated that Solowsky was a

"well-respected lawyer" who was "held in high regard by his peers."  (Trial Tr. at 166.)  He also claimed that Solowsky had no motive to steal six million dollars because such a theft would have put "[Solowsky's] reputation at risk."  (Id. at 166-67.)  Hawksbay objected after defense counsel finished its opening argument, claiming that Solowsky had put his own reputation at issue and that he thus "opened the door" to the introduction of rebuttal reputation evidence.  (Id. at 265-66.)  The district court did acknowledge that defense counsel referenced Solowsky's reputation during his opening (id. at 266-68), and warned that "if the defendant is going to put the character and reputation of the defendant before the jury, the plaintiff has every right in the world to respond to that," (id. at 266).  The court also noted it had instructed the jury that attorneys' opening statements were not to be considered evidence.  (Id. at 267.)  Ultimately the court stated that if defense counsel introduced evidence of Solowsky's reputation during his case in chief, he would essentially be "opening the door" to rebuttal reputation evidence.  (Id. at 267.)

Hawksbay argues that it should have been allowed introduce rebuttal evidence of  Solowsky's reputation.  We do recognize the concept of "curative admissibility" - also called "opening the door" or "fighting fire with fire."  Here, however, it is difficult to issue a ruling because Plaintiffs did not proffer specific

rebuttal evidence on this topic, and Defendants never put on a case-in-chief. However, because we are sending Hawksbay's claims back to district court to be retried, we will state that we share the district court's concern on this topic. We agree that if defense counsel actually introduced the sort of reputation evidence to which he alluded in his opening, Plaintiffs would be able to rebut with reputation evidence of their own. It also may well be that defense counsel did "open the door" to such evidence with his statements during opening argument. However, these issues are best resolved in the context of the second trial.

### 3. The Parties' Attempts to Settle Kobarid

Hawksbay claims that the district court erred in precluding it from "rebutting" or "impeach[ing]" defense counsel's statement in his opening that Solowsky attempted to settle Kobarid but his pleas "fell on deaf ears." (Id. at 186, 302, 303.) According to Hawksbay, before trial Defendants moved to exclude all evidence related to "any attempt to settle Kobarid" and the district court granted this motion. (Initial Br. at 15.) This is not accurate, however - what Defendants moved to exclude was evidence related to the parties' attempts to settle the Kobarid *disqualification dispute*. (See D.E. #126.) The court did grant this request. (See D.E. #166.)

At trial during Fausto's redirect examination, Hawksbay's counsel attempted

to question Fausto about a letter he told his lawyer to send to Solowsky which addressed the topic of settling <u>Kobarid</u>. (Trial Tr. at 206-08, 303-04.) Defense counsel spoke up and stated that in his view Hawksbay was "opening the door" to a "privileged communication," and that "[i]f it does [open the door], fine; and we'll go through it. If it doesn't, then I object to the question." (<u>Id.</u> at 206.) The court "sustained" the objection. (<u>Id.</u> at 207.)

There appears to be some confusion on this topic. Prior to trial, the court did not exclude *all* evidence related to the parties' attempts to settle <u>Kobarid</u> - only their attempts to settle a very specific issue within the <u>Kobarid</u> litigation: Defendants' disqualification as Reizen's counsel. Thus, Hawksbay's counsel should have been free to question Fausto on his instructions to his attorney insofar as they pertained to settling the <u>Kobarid</u> lawsuit. We see no other reason to keep out such testimony, and thus we find the district court abused its discretion in excluding it.[37]

### 4. Evidence related to <u>Kobarid</u>

---

[37] It appears that the district court did not fully understand the basis for defense counsel's objection. Defense counsel could not have been objecting on the basis that Hawksbay was inquiring into a "privileged communication" Fausto had with his attorney. That privilege would have belonged to Fausto, and in testifying on this topic he was clearly waiving it. <u>See, e.g.</u>, <u>Cox v. Adm'r U.S. Steel & Carnegie</u>, 17 F.3d 1386, 1417 (11th Cir. 1994) ("The attorney-client privilege 'belongs solely to the client,' and the client may waive it, either expressly or by implication.") (quoting <u>In re Von Bulow</u>, 828 F.2d 94, 100-01 (2d Cir. 1987)). It appears that defense counsel was merely making it clear that if Fausto waived his privilege on this point, defense counsel intended to question him on it as well.

Hawksbay takes issue with the district court's excluding evidence of Hawkbsay's inability to collect the vast majority of the Kobarid judgment against Reizen. (See D.E. #166.) Hawksbay claims that "[b]ecause the jury was aware that Hawksbay had sued Reizen in another matter, yet was called as a witness by Hawksbay, the jury might have suspected that Reizen had a motive to give such testimony." (Initial Br. at 60) (citations omitted). Hawksbay claims that "[t]o dispense that notion, Hawksbay could have showed that it attempted to collect the Kobarid judgment, but Reizen had essentially no locatable assets from which to draw." (Id.) (citations omitted). We do not believe the district court abused its discretion in excluding such evidence. As we explained above, the district court did not abuse its discretion in preventing Hawksbay from mentioning the outcome of Kobarid, because of the serious potential for confusion and also because that outcome was still under appeal at the time of the trial in this case. Clearly, allowing Hawksbay to reference its inability to collect the judgment would have necessitated an explanation of the result itself. Further, if the jury did not know the outcome in Kobarid, we cannot see how it would assume anything one way or the other about Reizen's motive for testifying on Hawksbay's behalf.

Finally, Hawksbay argues that the district court erred in refusing to allow any reference to Defendants' disqualification as Reizen's attorneys in Kobarid.

(See D.E. #166.) Hawksbay made clear at a pretrial conference that it did not seek to introduce the *substance* of the magistrate's disqualification order or the trial court's order adopting it. Instead, Hawkbsay wanted to introduce the mere fact that Defendants were disqualified from representing Reizen in Kobarid.[38] Hawksbay claimed that it needed to explain to the jury that Defendants originally represented Reizen until they were disqualified and different counsel took over, and that it was the new counsel who informed Hawksbay of the six million dollars in trust. In response Defendants argued that any reference to the fact of disqualification, without its context, would be highly prejudicial because it would suggest to the jury that they had engaged in wrongdoing. As Defendants pointed out, the orders themselves explained that Defendants were disqualified based on their prior representation of Tambourine (a plaintiff in Kobarid).[39]

The district court did not abuse its discretion here. The court could have reasonably determined, based on Rule 403, that the danger of unfair prejudice in allowing evidence of the disqualification - without its context - substantially

---

[38] Hawksbay's attorney stated at the November 30, 2007 Pretrial Conference: "we do not intend to present the substance of the [disqualification] orders. There were two orders. . . . And they certainly detail very carefully the various bases for disqualifying the firm. All we're asking, your Honor, is to be able to reference the fact that it occurred . . . ."

[39] The magistrate's order explicitly stated that the disqualification should not be read to imply any ethical misconduct on Defendants' parts. (See Kobarid, April 1, 2005 Order Granting Motion to Disqualify Counsel at 2.)

outweighed its probative value. We especially note that the court only prevented Hawksbay from mentioning the fact of disqualification. The court did not prevent Hawksbay from mentioning that it was Reizen's new counsel, not Defendants, who disclosed the existence and location of the six million dollars in trust.

### III. CONCLUSION

In sum, we reverse the district court's grant of Defendants' Rule 50 Motion on Hawksbay's conversion and civil theft claims; we affirm the court's grant of Defendants' Rule 50 Motion on Tambourine's breach of fiduciary duty claim; we find the court abused its discretion in excluding the Turner evidence; we find the court did not abuse its discretion in excluding the outcome in Kobarid; we find the court abused its discretion in excluding Peterson's testimony regarding Solowsky's reaction during his deposition, as well as evidence of the parties' attempts to settle Kobarid; and we affirm on the remaining evidentiary issues.

REVERSED IN PART; AFFIRMED IN PART; AND REMANDED.